# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

October 21, 2024

2:24-CV-1461

Case No.:
[COMPLAINT]
[JURY TRIAL DEMANDED]

RECEIVED

Diamond Buchanan
3944 Monroeville Blvd C10
Monroeville, Pennsylvania, 15146
(321) 374-7865
diamondbuchanan90@gmail.com

OCT 2 1 2024

CLERK, U.S. DISTRICT COURT
FOR THE WESTERN DISTRICT
OF PENNSYLVANIA

## INTRODUCTION

Plaintiff, Diamond Buchanan, brings this Complaint against Defendants Apple Inc., Samsung, Mercedes-Benz, Chanel, Nike, Rolex, Municipality of Monroeville Police Department, and other individuals and entities involved. The Plaintiff alleges that the Defendants have jointly participated in a trade secret misappropriation operation, utilizing Remote Neural Monitoring (RNM) and related technologies to engage in a pattern of coercion, surveillance, physical and psychological harassment, and the unlawful use of intellectual property.

The Plaintiff asserts that the Defendant's actions constitute violations of federal law, including the Racketeer Influenced and Corrupt Organizations Act (RICO), through their involvement in an organized criminal scheme designed to exploit and harm the Plaintiff. This misconduct includes coordinated stalking, harassment, and civil rights violations, all of which have caused substantial harm to the Plaintiff.

This Complaint seeks appropriate relief for the damages suffered due to the Defendant's illegal and malicious actions, asserting that their prolonged pattern of misconduct has resulted in significant physical, emotional, and intellectual harm.

## JURISDICTION AND VENUE

Jurisdiction
This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, as this case arises under the laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, and 42 U.S.C. § 1983 for violations of the Plaintiff's constitutional rights. The Court also has jurisdiction pursuant to 18 U.S.C. § 1964(c), which provides for civil remedies for violations of the RICO Act.

Additionally, this case includes claims under the following statutes:

- 440: Civil Rights – Other Civil Rights Claims
- 480: Consumer Credit
- 330: Federal Employer's Liability
- 360: Personal Injury – Other Personal Injury
- 362: Personal Injury – Medical Malpractice
- 365: Personal Injury – Product Liability
- 370: Other Fraud
- 380: Other Personal Property Damage
- 880: Defend Trade Secrets Act of 2016
- 890: Other Statutory Actions
- 895: Freedom of Information Act
- 950: Constitutionality of State Statutes

Moreover, this Court has jurisdiction under 28 U.S.C. § 1332(a) because the action is between citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

The Court also has supplemental jurisdiction over related state law claims under 28 U.S.C. § 1367, as those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

Venue

Venue is proper in this District under 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Furthermore, at least one Defendant resides, is found, or transacts business within this District, and the unlawful acts giving rise to this action were committed in this District. Therefore, this District is the appropriate venue for this action under federal law.

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims arise under federal law, including the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, and various constitutional amendments. Additionally, this Court has jurisdiction under 28 U.S.C. § 1332, as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states and/or foreign states. The Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602-1611, also provides jurisdiction over claims against foreign state actors involved in the unlawful activities described herein.

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF PENNSYLVANIA

October 21, 2024

Joseph F. Weis Jr. Courthouse
700 Grant Street
Pittsburgh, PA 15219

Diamond Buchanan
3944 Monroeville Blvd C10
Monroeville, Pennsylvania, 15146
(321) 374-7865
diamondbuchanan90@gmail.com

Case No.:

## PARTIES

Plaintiff

1. Plaintiff Diamond Buchanan is an individual residing in Monroeville, Pennsylvania. The
   Plaintiff is the owner of proprietary trade secrets, including unique designs,
   manufacturing processes, and other confidential information related to various industries
   such as high-end fashion, technology, and entertainment. The Plaintiff has suffered
   significant harm due to The Defendants unlawful actions, including continuous
   surveillance, harassment, and misappropriation of trade secrets.

Defendant(s)

1. Defendant 1: Prof. Tamar Makin and Dani Clode is a Prof. Tamar Makin is a
   neuroscientist and the head of the Plasticity Lab at the University of Cambridge. Her
   research focuses on brain plasticity, particularly in relation to hand representation and the
   use of augmentative technologies such as the Third Thumb. Dani Clode is a designer
   collaborating with the Plasticity Lab at the University of Cambridge. She is known for
   developing the Third Thumb, a prosthetic device aimed at enhancing motor capabilities
   and expanding the functionality of the human hand.

2. Defendant 2: Apple Inc. is an American multinational technology company founded in
   1976 by Steve Jobs, Steve Wozniak, and Ronald Wayne. Known for its innovation in
   computer software, personal computers, mobile devices, and consumer electronics, Apple
   has revolutionized the technology sector with products like the iPhone, iPad, Mac
   computers, and the Apple Watch. The company is headquartered in Cupertino, California.

3. Defendant 3: Samsung Electronics Co., Ltd. is a South Korean multinational corporation that manufactures a wide range of consumer electronics, including smartphones, televisions, and home appliances. Founded in 1969, Samsung is a global leader in technology and innovation, with a significant presence in the semiconductor and display industries.

4. Defendant 4: Huawei Technologies Co. Ltd. is a Chinese multinational technology company founded in 1987 by Ren Zhengfei. It is a leading global provider of information and communications technology (ICT) infrastructure and smart devices. Huawei designs, develops, manufactures, and sells telecommunications equipment, consumer electronics, and smart devices. The company operates in over 170 countries and serves more than three billion people worldwide.

5. Defendant 5: Mercedes-Benz USA is a subsidiary of the German multinational automotive corporation Mercedes-Benz Group. Founded in 1965, Mercedes-Benz USA is responsible for the distribution, marketing, and customer service for all Mercedes-Benz products in the United States. The company is headquartered in Sandy Springs, Georgia, and employs approximately 1,400 people. Mercedes-Benz USA has been recognized multiple times as a top employer by Fortune.

6. Defendant 6: General Motors Company (GM) is an American multinational automotive manufacturing corporation founded in 1908 by William C. Durant. Headquartered in Detroit, Michigan, GM is one of the largest car and truck manufacturers in the world. The company produces vehicles under several brands, including Chevrolet, Buick, GMC, and Cadillac. GM operates manufacturing plants in multiple countries and is known for its innovation in automotive technology and commitment to sustainability.

7. Defendant 7: Hyundai Motor Company is a South Korean multinational automotive manufacturer founded in 1967 by Chung Ju-Yung. Headquartered in Seoul, Hyundai is one of the largest automobile manufacturers in the world, producing a wide range of vehicles including cars, trucks, and buses. The company is known for its innovation in automotive technology and operates the world's largest integrated automobile manufacturing facility in Ulsan, South Korea.

8. Defendant 8: Volkswagen Group of America, Inc. (VWGoA) is a wholly owned subsidiary of Volkswagen AG, one of the world's leading automobile manufacturers and the largest carmaker in Europe. VWGoA oversees the U.S. operations of several distinguished brands, including Audi, Bentley, Bugatti, Lamborghini, and Volkswagen. The company operates a state-of-the-art assembly facility in Chattanooga, Tennessee, and

provides financial services through VW Credit, Inc. VWGoA is headquartered in Herndon, Virginia, and employs approximately 10,000 people in the United States.

9. Defendant 9: Stellantis N.V. is a multinational automotive manufacturing corporation formed in 2021 through the merger of Fiat Chrysler Automobiles (FCA) and the PSA Group. Headquartered in Hoofddorp, Netherlands, Stellantis is one of the world's largest automakers, producing vehicles under 14 brands including Abarth, Alfa Romeo, Chrysler, Citroën, Dodge, DS, Fiat, Jeep, Lancia, Maserati, Opel, Peugeot, Ram Trucks, and Vauxhall. The company is known for its commitment to innovation, sustainability, and providing a wide range of mobility solutions.

10. Defendant 10: Renault USA, Inc. is a subsidiary of the French multinational automobile manufacturer Renault S.A. Founded in 1899, Renault is known for producing a wide range of cars and vans and has a significant presence in the global automotive market. Renault USA handles the distribution, marketing, and customer service for Renault vehicles in the United States. The company is part of the Renault–Nissan–Mitsubishi Alliance, which is one of the largest automotive groups in the world.

11. Defendant 11: MG Motor is an automotive brand owned by the Shanghai-based, state-owned carmaker SAIC Motor. Originally established in 1924 as Morris Garages in the United Kingdom, MG Motor is known for producing a range of vehicles including sedans, SUVs, and electric cars. Since 2007, the brand has been under the control of SAIC Motor, which has expanded its global presence significantly.

12. Defendant 12: Verge Motorcycles OÜ is an Estonian electric motorcycle manufacturer known for its innovative design and technology. Founded by a team of former tech industry professionals, Verge Motorcycles aims to disrupt the motorcycle industry with its all-electric superbikes. The company is recognized for its unique motor technology, which integrates the motor directly into the rear wheel, enhancing performance and handling. Verge Motorcycles operates globally, with showrooms in various locations including London and California.

13. Defendant 13: Vetements Group AG is a Swiss luxury fashion house founded in 2014 by Georgian designers Demna Gvasalia and Guram Gvasalia. Known for its avant-garde and subversive approach to fashion, Vetements has quickly gained a reputation for its innovative designs and unique runway shows. The brand operates out of its headquarters in Zurich, Switzerland, and continues to influence the global fashion industry with its distinctive style and collaborations.

14. Defendant 14: Chanel, Inc. is a subsidiary of the French luxury fashion house Chanel S.A., founded in 1910 by Coco Chanel. Known for its high-end fashion, luxury goods, and accessories, Chanel has become a global icon in the fashion industry. The company is renowned for its timeless designs, including the Chanel No. 5 perfume and the Chanel suit. Chanel, Inc. manages the brand's operations in the United States, including retail, marketing, and customer service.

15. Defendant 15: Balenciaga America Inc. is a subsidiary of the French luxury fashion house Balenciaga, which was founded in 1919 by Cristóbal Balenciaga. Known for its innovative and avant-garde designs, Balenciaga produces a wide range of luxury clothing, shoes, bags, and accessories for both men and women. The company operates numerous retail locations across the United States and is recognized for its significant influence in the fashion industry.

16. Defendant 16: Louis Vuitton North America, Inc. is the North American operating subsidiary of the French luxury goods giant LVMH Moët Hennessy Louis Vuitton. The company manages the fashion and leather goods business for Louis Vuitton in the United States. Known for its high-end fashion, leather goods, and accessories, Louis Vuitton has established itself as a leading symbol of luxury and craftsmanship. The company operates numerous retail locations across the U.S. and is renowned for its iconic monogram patterns and timeless designs.

17. Defendant 17: Guccio Gucci S.p.A., commonly known as Gucci, is a renowned Italian luxury fashion house founded in 1921 by Guccio Gucci. The company is known for its high-end fashion, leather goods, and accessories, and has become a global symbol of Italian craftsmanship and luxury. Gucci operates numerous retail locations worldwide and is a subsidiary of the French multinational corporation Kering.

18. Defendant 18: Alexander McQueen Trading Limited is a British luxury fashion house founded in 1992 by the designer Alexander McQueen. Known for its innovative and avant-garde designs, the company specializes in haute couture, ready-to-wear, and premium accessories. The brand has gained international acclaim for its unique aesthetic and provocative runway shows. Alexander McQueen Trading Limited operates under the parent company Kering and continues to influence the global fashion industry with its cutting-edge designs.

19. Defendant 19: Undercover Co., Ltd. is a Japanese luxury fashion house founded by designer Jun Takahashi in 1993. Known for its unique blend of art, music, and subculture influences, Undercover has gained international acclaim for its avant-garde and high-end

fashion collections. The brand operates out of its headquarters in Tokyo and is recognized for its innovative designs and distinctive aesthetic.

20. Defendant 20: Comme des Garçons Co. Ltd. is a Japanese fashion label founded in 1969 by designer Rei Kawakubo. Known for its avant-garde and deconstructive designs, the brand has significantly influenced the fashion industry with its unconventional aesthetics and innovative use of materials. Comme des Garçons operates globally, with flagship stores in major cities such as Tokyo, Paris, and New York. The company produces a wide range of products, including apparel, accessories, and perfumes.

21. Defendant 21: Kids Love Gaite Co. Ltd. is a Japanese fashion brand known for its high-quality footwear and unique designs. Founded by designer Takahiro Miyashita, the brand has gained recognition for its innovative approach to traditional shoemaking techniques. Kids Love Gaite operates out of its headquarters in Tokyo and has a strong presence in the global fashion market.

22. Defendant 22 H & M Hennes & Mauritz AB, commonly known as H&M, is a multinational fashion retailer headquartered in Stockholm, Sweden. Founded in 1947 by Erling Persson, H&M is known for its fast fashion business model, offering affordable clothing, accessories, and homeware. The company operates over 4,000 stores in more than 75 markets worldwide and employs over 100,000 people. H&M is committed to sustainability and innovation in the fashion industry.

23. Defendant 23: 3.PARADIS is a luxury fashion house founded in 2013 by designer Emeric Tchatchoua. Known for its innovative and culturally rich designs, the brand blends craftsmanship, powerful messages, and unique styles to create luxurious and inspiring fashion. 3.PARADIS has gained international acclaim for its collections that promote values of liberation, universalism, and hope.

24. Defendant 24: JORDANLUCA, Ltd. is a British luxury fashion brand founded in 2018 by designers Jordan Bowen and Luca Marchetto. The brand is known for its unique blend of Italian heritage and the raw intensity of London, creating a distinctive approach to menswear and masculinity. JORDANLUCA has gained international recognition for its innovative designs and commitment to craftsmanship, with collections featured in prestigious publications and stocked in high-end retailers worldwide.

25. Defendant 25: Ralph Lauren Corporation is a global leader in the design, marketing, and distribution of premium lifestyle products, including apparel, accessories, home furnishings, and other licensed product categories. The company operates through a network of retail stores, wholesale channels, and e-commerce platforms.

26. Defendant 26: Goyard Inc. is a luxury French fashion house specializing in high-end leather goods, including handbags, luggage, and accessories. The company is known for its exclusive and artisanal products, which are sold through a limited number of boutiques worldwide. Goyard maintains a reputation for discretion and exclusivity, often avoiding advertising and media attention.

27. Defendant 27: Denim Tears LLC. is an apparel brand founded by Tremaine Emory in 2019. The company specializes in storytelling through clothing, highlighting themes related to the African Diaspora. Denim Tears offers a variety of products, including jackets, pants, shirts, and accessories, and is known for its collaborations with brands such as Ugg, Stüssy, Champion, Converse, ASICS, and Dior.

28. Defendant 28: Loewe S.A. is a luxury fashion house specializing in leather goods, clothing, perfumes, and other fashion accessories. Founded in 1846 in Madrid, Loewe is one of the oldest luxury brands in the world and is part of the LVMH group. The company is known for its high-quality craftsmanship and exclusive products, which are sold through a network of boutiques worldwide.

29. Defendant 29: Chrome Hearts LLC. is a luxury brand renowned for its high-end jewelry, leather goods, apparel, and accessories. Established in 1988, the company is celebrated for its distinctive gothic aesthetic and exceptional craftsmanship. Chrome Hearts products are distributed through exclusive boutiques globally and are highly coveted for their unique designs and quality.

30. Defendant 30: Belts by Simon, Inc. is a company renowned for its luxury belts and accessories, marketed under the brand name B.B. Simon. The company is known for its exceptional craftsmanship and unique designs, offering a variety of products including belts, bags, and other fashion accessories through multiple retail channels.

31. Defendant 31: Wockstar LLC. is a retail company specializing in used merchandise, including clothing and shoes. The company operates in the sporting goods, hobby, musical instrument, book, and miscellaneous retail sectors, offering a wide range of secondhand products to its customers.

32. Defendant 32: Nike, Inc. is a leading multinational corporation specializing in the design, development, manufacturing, and marketing of footwear, apparel, equipment, accessories, and services. Established in 1964 as Blue Ribbon Sports and rebranded as Nike, Inc. in 1971, the company is renowned for its innovative products and strong global

brand presence. Nike operates through a vast network of retail stores, e-commerce platforms, and wholesale partners worldwide.

33. Defendant 33: Under Armour, Inc. is a leading multinational corporation specializing in the design, development, manufacturing, and marketing of branded athletic performance apparel, footwear, and accessories. Established in 1996, the company is renowned for its innovative products that enhance athletic performance. Under Armour operates through a vast network of retail stores, e-commerce platforms, and wholesale partners worldwide.

34. Defendant 34: Adidas AG is a leading multinational corporation specializing in the design, manufacture, and marketing of athletic and sports lifestyle products, including footwear, apparel, and accessories. Established in 1949, the company is renowned for its innovative products and iconic three-stripe logo. Adidas operates globally through a vast network of retail stores, e-commerce platforms, and wholesale partners.

35. Defendant 35: PUMA SE is a leading multinational corporation specializing in the design, manufacture, and marketing of athletic and casual footwear, apparel, and accessories. Established in 1948, the company is renowned for its innovative products and iconic branding, including the distinctive "Formstrip" and leaping cat logo. PUMA operates globally through a vast network of retail stores, e-commerce platforms, and wholesale partners, and is committed to sustainability and social responsibility.

36. Defendant 36: ROMBAUT SRL is a fashion company specializing in designer footwear, apparel, and accessories. Founded in 2013 by Mats Rombaut, the company is renowned for its commitment to sustainability and the use of vegan materials. ROMBAUT offers a variety of innovative and eco-friendly products, which are distributed through multiple retail channels and online platforms.

37. Defendant 37: The Timberland Company is a subsidiary of VF Corporation, specializing in the design, manufacture, and marketing of outdoor footwear, apparel, and accessories. Established in 1952 and incorporated in 1978, Timberland is renowned for its high-quality, durable products, including the iconic "Yellow Boot." The company operates globally through a network of retail stores, e-commerce platforms, and wholesale partners.

38. Defendant 38: Carhartt, Inc. is a renowned American clothing company specializing in durable workwear, including jackets, coats, overalls, coveralls, vests, shirts, jeans, and fire-resistant clothing. Established in 1889, Carhartt is celebrated for its high-quality, rugged apparel designed for manual laborers and outdoor enthusiasts. The company

operates globally through a network of retail stores, e-commerce platforms, and wholesale partners.

39. Defendant 39: Ulysse Nardin, Inc. is a subsidiary of the Swiss luxury watchmaking company Ulysse Nardin SA, established in 1846. The company is renowned for its high-end timepieces, including marine chronometers and wristwatches, known for their technical excellence and innovative designs. Ulysse Nardin operates globally through a network of distributors and boutiques.

40. Defendant 40: Horométrie SA is a Swiss company specializing in the distribution of luxury watches under the Richard Mille brand. Founded in 2001, the company is known for its high-end, technologically advanced timepieces. Horométrie SA operates globally, providing distribution and support for Richard Mille watches through a network of associated partners.

41. Defendant 41: Seiko Watch Corporation is a subsidiary of Seiko Group Corporation, specializing in the design, manufacture, and marketing of watches. Established in 1881, Seiko is renowned for its innovative timepieces and significant contributions to watchmaking technology. The company operates globally through a network of retail stores, e-commerce platforms, and wholesale partners.

42. Defendant 42: Hublot of America, Inc. is a subsidiary of the Swiss luxury watch brand Hublot, renowned for its innovative designs and high-quality timepieces. The company specializes in the design, manufacture, and marketing of luxury watches, reflecting Swiss watchmaking excellence. Hublot operates globally through a network of boutiques and authorized retailers.

43. Defendant 43: Rolex Watch U.S.A., Inc. is the exclusive distributor of Rolex watches and products in the United States. As a subsidiary of the Swiss luxury watchmaker Rolex SA, the company is renowned for its high-quality, precision timepieces. Rolex Watch U.S.A., Inc. oversees the marketing, sales, and service of Rolex products throughout the U.S., maintaining a significant presence in the luxury watch market.

44. Defendant 44: Jacob & Co. Inc. is a privately held luxury jewelry and watch retailer founded in 1986 by Jacob Arabo. The company is renowned for its innovative designs and high-quality craftsmanship, offering a wide range of jewelry and timepieces. Jacob & Co. operates globally, catering to a high-profile clientele through its flagship boutique in Manhattan and other exclusive retail locations.

45. Defendant 45: Patek Philippe USA, Inc. is the exclusive distributor of Patek Philippe watches and products in the United States. As a subsidiary of the Swiss luxury watchmaker Patek Philippe SA, the company is renowned for its high-quality, precision timepieces. Patek Philippe USA, Inc. oversees the marketing, sales, and service of Patek Philippe products throughout the U.S., maintaining a significant presence in the luxury watch market.

46. Defendant 46: Casio America, Inc. is a subsidiary of the Japanese electronics giant Casio Computer Co., Ltd. The company specializes in the design, manufacture, and marketing of a wide range of consumer electronics, including watches, calculators, musical instruments, and digital cameras. Casio America, Inc. is known for its innovative products and strong presence in the electronics market, operating through various retail channels and online platforms.

47. Defendant 47: USAPE LLC, also known as BAPE, is a fashion company specializing in streetwear and footwear. The company is renowned for its distinctive designs and collaborations with various brands. USAPE LLC operates globally through a network of retail stores, e-commerce platforms, and wholesale partners.

48. Defendant 48: Adabar Ltd., is a company registered in the Bahamas. Its primary business appears to be ship ownership, as indicated by its listing in the Maritime Directory.[1] However, there is limited public information available about its specific operations, fleet size, or other details.

49. Defendant 49: Vacheron Constantin SA is a Swiss luxury watch and clock manufacturer founded in 1755. The company is one of the oldest watch manufacturers in the world with an uninterrupted history of watchmaking. Vacheron Constantin is renowned for its high-quality, precision timepieces and innovative designs. The company operates globally through a network of boutiques and authorized retailers and has been a subsidiary of the Richemont Group since 1996.

50. Defendant 50: Ludovic Ballouard SA is a Swiss watchmaking company founded by master watchmaker Ludovic Ballouard. The company is renowned for its innovative and highly complicated timepieces, including the "Upside Down" and "Half Time" models. Ludovic Ballouard SA operates globally, offering exclusive, handcrafted watches that emphasize unique design and technical excellence.

51. Defendant 51: Softwatch Ltd. is a company specializing in application usage analytics. The company's SaaS solutions enable enterprises to manage the transition of business applications to the cloud, optimize their hybrid cloud environments, and reduce software

spending. Softwatch Ltd. also assists companies in analyzing their readiness to adopt Chrome devices.

52. Defendant 52: Piaget SA is a Swiss luxury watchmaker and jeweler founded in 1874 by Georges Edouard Piaget. The company is renowned for its high-quality, precision timepieces and innovative designs. Piaget SA operates globally through a network of boutiques and authorized retailers and is a subsidiary of the Richemont Group.

53. Defendant 53: IWC International Watch Co. AG, also known as IWC Schaffhausen, is a Swiss luxury watch manufacturer founded in 1868 by American watchmaker Florentine Ariosto Jones. The company is renowned for its high-quality, precision timepieces and innovative designs, particularly in the realm of pilot and aviation watches. IWC operates globally through a network of boutiques and authorized retailers and is a subsidiary of the Richemont Group.

54. Defendant 54: Berneron SA is an independent watchmaker based in Neuchâtel, Switzerland. Founded by Sylvain Gauthier Berneron, the company is known for its meticulous craftsmanship and innovative designs in the field of horology. Berneron SA produces a limited number of high-quality timepieces annually, emphasizing artistic expression and traditional watchmaking techniques.

55. Defendant 55: Officine Panerai S.p.A. is an Italian luxury watch manufacturer, known for its high-end timepieces. Founded in 1860 by Giovanni Panerai in Florence, the company is now a wholly owned subsidiary of Compagnie Financière Richemont S.A. Panerai designs, manufactures, and markets watches through authorized dealers and company-owned stores worldwide. The company is renowned for its iconic Luminor and Radiomir models.

56. Defendant 56: Richemont North America, Inc. is a subsidiary of Compagnie Financière Richemont SA, a Swiss luxury goods holding company. Richemont North America manufactures and distributes luxury goods, including jewelry, precious stones and metals, costume jewelry, watches, clocks, and silverware. The company operates in the wholesale distribution sector and serves markets worldwide.

57. Defendant 57: Audemars Piguet (North America) Inc. is a subsidiary of the Swiss luxury watchmaker Audemars Piguet Holding SA. The company manufactures and distributes high-end watches for men and women, and provides services such as repair, maintenance, refinishing, water resistance testing, and warranty services. Audemars Piguet is renowned for its craftsmanship and innovation in the watchmaking industry.

58. Defendant 58: Bovet Fleurier S.A. is a Swiss luxury watchmaker founded in 1822 by Édouard Bovet. The company is renowned for its high-end artistic watches, which often feature intricate miniature paintings, engraving, and tourbillons. Bovet initially gained fame for its pocket watches designed for the Chinese market in the 19th century. Today, it continues to produce exquisite timepieces that blend traditional craftsmanship with modern innovation.

59. Defendant 59: MB&F SA, which stands for Maximilian Büsser & Friends, is a Swiss watchmaking company founded in 2005. The company is known for its innovative and unconventional timepieces, often referred to as "Machines." MB&F collaborates with independent watchmaking professionals to create unique, three-dimensional kinetic sculptures that reinterpret traditional watchmaking. The company also operates the M.A.D.Gallery, which showcases mechanical and kinetic art.

60. Defendant 60: Manufacture Jaeger-LeCoultre SA, founded in 1833 by Antoine LeCoultre, is a Swiss luxury watch and clock manufacturer. The company is renowned for its high-quality timepieces and innovative watchmaking techniques. Located in the Vallée de Joux, Switzerland, Jaeger-LeCoultre is a fully integrated manufacture, producing all components of its watches in-house. Since 2000, it has been a subsidiary of the Swiss luxury group Richemont.

61. Defendant 61: Konstantin Chaykin is a renowned Russian watchmaker and inventor, known for his innovative and unique timepieces. He founded his own brand, Konstantin Chaykin, in 2003 and has since become a prominent figure in the world of haute horlogerie. Tschaikin holds numerous patents for his inventions and has created some of the most complex mechanical watches and clocks, including the Moscow Computus Clock and the Joker watch.

62. Defendant 62: Alexander Shorokhoff Uhrenmanufaktur GmbH is a German luxury watch manufacturer known for its highly artistic and avant-garde designs. Founded in 1992 by Alexander Shorokhoff, the company produces mechanical wristwatches that blend traditional craftsmanship with innovative aesthetics. The headquarters is located in Alzenau, Bavaria, and the company is celebrated for its limited edition timepieces that often feature unique artistic elements.

63. Defendant 63: Greubel Forsey SA is a Swiss watchmaking company specializing in complicated, high-end timepieces. Founded in 2004 by Robert Greubel and Stephen Forsey, the company is based in La Chaux-de-Fonds, Switzerland. Greubel Forsey is renowned for its innovative designs, including multiple tourbillons and inclined balance wheels, aimed at improving timekeeping precision.

64. Defendant 64: Glock, Inc. is a leading global manufacturer of firearms, known for its polymer-based pistols. Founded in 1985 as the first subsidiary of Glock Ges.m.b.H., the company produces a wide range of pistols for military, law enforcement, and civilian use. Glock pistols are renowned for their reliability, safety, and simplicity, making them a favorite among various armed forces and security agencies worldwide.

65. Defendant 65: Glock Ges.m.b.H. is an Austrian firearms manufacturer founded by Gaston Glock in 1963. The company is known for its innovative polymer-framed pistols, which have become a standard in the industry. Glock Ges.m.b.H. also produces field knives, entrenching tools, and other tactical equipment. The company's products are used by military, law enforcement, and civilian markets worldwide.

66. Defendant 66: Carl Walther GmbH Sportwaffen, commonly known as Walther, is a German firearm manufacturer founded in 1886 by Carl Walther. The company is renowned for its high-quality pistols and sporting weapons, which are used by police, military, and civilian markets worldwide. Walther is known for iconic models such as the PPK and P99, which have gained legendary status in both real-world and fictional contexts.

67. Defendant 67: Bintac, LLC is a distributor of AEA airguns and also designs its own brand of airguns. The company is based in Massachusetts, USA, and offers a range of airguns, certified slugs, and pellets. Bintac, LLC also provides mechanical support and service for AEA airguns.

68. Defendant 68: LANTAC USA LLC is a manufacturer of high-quality accessories for AR-15, M16, and M4 type rifles. The company specializes in precision-made rifles, muzzle brakes, and other firearm components. Based in Fort Worth, Texas, LANTAC USA is known for its innovative designs and commitment to quality, serving both civilian and professional markets.

69. Defendant 69: X Products LLC is a manufacturer of high-quality firearm accessories, including AR-15 can cannons, XM42 flamethrowers, golf ball launchers, and various ammunition. The company is known for its innovative and aesthetically appealing products designed for law enforcement, military, and sport shooting enthusiasts.

70. Defendant 70: FN Herstal, also known as Fabrique Nationale Herstal, is a leading firearms manufacturer based in Herstal, Belgium. Founded in 1889, the company designs, develops, manufactures, and sells a wide range of small arms and associated ammunition.

FN Herstal's products are used by military, security, and special forces worldwide. The company is known for iconic firearms such as the FN FAL, FN SCAR, and FN P90

71. Defendant 71: Viridian Weapon Technologies is a leader in weapon-mounted aiming devices and accessories. The company is known for its innovations in green and red laser sights, weapon-mounted cameras, ECR INSTANT-ON activation technology, TacLoc holsters, taclights, and LED weapon-mounted illuminators. Viridian designs compact, powerful self-defense products for civilian, military, and law enforcement markets.

72. Defendant 72: Recover Innovations Inc, also known as RI International, is a non-profit organization providing mental health and substance abuse treatment services. Founded in 2004, the company offers a range of outpatient treatment options, including intensive outpatient and partial care services. Recover Innovations Inc is licensed by the State of New Jersey, Division of Mental Health and Substance Abuse, and serves over 500 clients annually.

73. Defendant 73: Kel-Tec CNC Industries Inc., commonly referred to as Kel-Tec, is an American developer and manufacturer of firearms. Founded by George Kellgren in 1991 and based in Cocoa, Florida, the company has manufactured firearms since 1995, starting with semi-automatic pistols and expanding to rifles and shotguns. Kel-Tec is known for its innovative designs and high-performance firearms, serving military, law enforcement, and civilian markets worldwide.

74. Defendant 74: Boost Toys is a company that produces and sells gel blasters, which are toy guns that shoot gel pellets. These products are marketed for all age groups and are often used for recreational activities similar to paintball or airsoft[1]. The company has faced some criticism and complaints from customers regarding delayed shipments and potentially misleading business practices

75. Defendant 75: Holosun Technologies Inc. is a leading manufacturer of innovative optic and laser/IR technologies for a broad range of shooting, hunting, law enforcement, and military needs. Established in 2013, Holosun is known for its high-quality products, including red dot sights, magnifiers, and laser/IR devices. The company is committed to producing cutting-edge equipment with superior quality at competitive prices.

76. Defendant 76: The Covert Arms HWS ARD (Anti-Reflection Device) is designed specifically for EOTech holographic sights. This device is engineered to eliminate unwanted glare and reflection, enhancing visual clarity and target acquisition. It is constructed from high-quality anti-reflective polymer and is compatible with various EOTech models, including the EXPS, XPS, 518, 558, 512, and 553 series. The HWS

ARD is known for its durability, ease of installation, and ability to maintain a sleek profile while providing superior performance in diverse lighting conditions.

77. Defendant 77: Buck Knives, Inc. is a renowned American knife manufacturer known for producing high-quality knives used in hunting, fishing, and outdoor activities. Founded in 1902, the company has a long-standing reputation for craftsmanship and innovation, and it is currently operated by the fourth generation of the Buck family.

78. Defendant 78: PES LASER is a company specializing in the research, development, production, and sales of laser equipment, including handheld and automatic laser welding machines, laser cleaning machines, and fiber laser cutting machines. The company exports its products to over 60 countries and regions, including the USA, Canada, Russia, Europe, and Southeast Asia.

79. Defendant 79: Crunchyroll, LLC is a leading global anime streaming service, offering a wide range of East Asian dramas, movies, and popular anime series. It is a joint venture between Sony Pictures Entertainment and Japan's Aniplex. Crunchyroll merged with Funimation in 2022 and serves millions of subscribers worldwide

80. Defendant 80: Netflix, Inc. is a leading global streaming entertainment service, offering a wide variety of TV series, documentaries, and feature films across numerous genres and languages. The company operates in over 190 countries and has over 200 million subscribers worldwide.

81. Defendant 81: Founded in 1991, Epic Games is an American company founded by CEO Tim Sweeney. The company is headquartered in Cary, North Carolina and has dozens of offices worldwide. Epic is a leading interactive entertainment company and provider of 3D engine technology.

82. Defendant 82: Northrop Grumman Corporation is a global aerospace and defense technology company headquartered in Falls Church, Virginia. Established in 1994 through the merger of Northrop Corporation and Grumman Corporation, the company specializes in the development and production of advanced systems for defense, civil, and commercial markets.

83. Defendant 83: The Central Intelligence Agency (CIA) is an independent agency of the U.S. government responsible for providing national security intelligence to senior U.S. policymakers. Its primary function is to gather, analyze, and disseminate intelligence related to foreign governments, corporations, and individuals to inform national security decision-making. The CIA conducts covert operations, engages in counterintelligence

activities, and oversees intelligence collection from various sources, including human intelligence (HUMINT) and technical intelligence. The agency plays a crucial role in supporting U.S. foreign policy and protecting the nation's interests abroad.

84. Defendant 84: The Federal Bureau of Investigation (FBI) is the principal federal investigative agency and domestic intelligence service of the United States. It operates under the jurisdiction of the Department of Justice and is tasked with enforcing federal laws, protecting and defending the U.S. against terrorist and foreign intelligence threats, and upholding civil rights. The FBI investigates a wide range of criminal activities, including cybercrime, organized crime, public corruption, white-collar crime, violent crime, and terrorism. It also provides support to local and state law enforcement agencies through its various programs and resources.

85. Defendant 85: The United States Drug Enforcement Administration (DEA) is a federal agency under the Department of Justice that focuses on combating drug trafficking and enforcing the controlled substances laws of the United States. The DEA's mission includes the identification, investigation, and apprehension of drug traffickers and those involved in the illegal drug trade. The agency works to reduce the availability of illicit drugs and to enforce regulations concerning the legal use of controlled substances. It collaborates with various law enforcement agencies at the local, state, and international levels to combat drug-related crime.

86. Defendant 86: National Security Agency/Central Security Service (NSA/CSS) is a key intelligence agency within the U.S. Department of Defense. Established in 1952, the NSA is responsible for global monitoring, collection, and processing of information and data for foreign and domestic intelligence and counterintelligence purposes. It specializes in signals intelligence (SIGINT) and information assurance, which involves protecting U.S. government communications and information systems from cyber threats.

87. Defendant 87: The Municipality of Monroeville Police Department is located in Allegheny County, Pennsylvania, about 10 miles east of downtown Pittsburgh. The department serves a community of approximately 29,000 residents, with an additional daily transient population of over 50,000 people. The police force consists of 44 officers who respond to around 16,000 service calls annually[2]. The department includes a Special Operations Division, which encompasses the Criminal Investigations (Detective) Division and the Patrol Division[2]. They also offer various community services, such as vacation home checks and an online non-emergency reporting system.

88. Description 88: The City of Pittsburgh is a municipal corporation in the Commonwealth of Pennsylvania. It operates under a Mayor-Council form of government, where the

Mayor is the chief executive officer and the City Council is the legislative body. The city government is responsible for a wide range of services, including public safety (police and fire departments), public works (infrastructure maintenance), parks and recreation, and zoning and urban planning.

89. Defendant 89: Allegheny Health Network (AHN) is a non-profit, integrated healthcare system serving Western Pennsylvania and surrounding regions. AHN operates 14 hospitals, over 250 clinical locations, and provides a wide range of services including quaternary and tertiary care, rehabilitation, cancer treatment, and home health services. It is a subsidiary of Highmark Health.

Joint Role of Companies:
The following companies and individuals are accused of participating in a coordinated operation involving illegal surveillance and the misappropriation of trade secrets through Remote Neural Monitoring (RNM) technology. Each entity acted in concert with government entities, fully aware of the physical and psychological harm inflicted upon The Plaintiff, which is ongoing to this day.

1. Prof. Tamar Makin & Dani Clode: Alleged research and development of neural or brain interface technologies, misappropriating trade secrets related to RNM.

2. Apple Inc., Samsung Electronics Co. Ltd., Huawei Technologies Co. Ltd.: Accused of utilizing trade secrets related to RNM technology for their products and research without consent.

3. Mercedes-Benz USA, Hyundai Motor Company, Volkswagen Group of America, General Motors Company, Stellantis N.V., Renault USA, Inc., MG Motor, Verge Motorcycles OÜ: Allegedly used stolen trade secrets to enhance vehicle technology or driver interfaces, knowingly participating in the ongoing infringement and abuse against The Plaintiff.

4. Vetements Group AG, Chanel, Inc., Balenciaga America, Inc., Louis Vuitton North America, Inc., Guccio Gucci S.p.A., Alexander McQueen Trading Limited, Undercover Co. Ltd., Maison Margiela, Comme des Garçons Co. Ltd., Kids Love Gaite Co. Ltd., H&M Hennes & Mauritz

AB, 3.PARADIS, Inc., JORDANLUCA, Ltd., Miyake Design Studio, Inc., Ralph Lauren Corporation, Goyard Inc., Denim Tears LLC, Loewe S.A., Chrome Hearts LLC, Belts by Simon, Inc., Wockstar, LLC.: Accused of misappropriating trade secrets to gain insights into trends and consumer behavior through RNM technology, while being aware of The Plaintiff's infringement and abuse.

5. Nike, Inc., Under Armour, Inc., Adidas AG, PUMA SE, The Timberland Company, Carhartt, Inc.: Allegedly utilized The Plaintiff's trade secrets related to customer data and behavior analysis sourced via RNM technology, with knowledge of the harm inflicted on The Plaintiff.

6. Rolex Watch U.S.A., Inc., Jacob & Co. Inc., Patek Philippe USA, Inc., Ulysse Nardin, Inc., Seiko Watch Corporation, Hublot of America, Casio America, Inc., USAPE, LLC, Adabar, Ltd., Vacheron Constantin SA, Ludovic Ballouard SA, Softwatch Ltd., Piaget SA, IWC International Watch Co. AG, Berneron SA, Officine Panerai S.p.A., Richemont North America, Inc., Audemars Piguet (North America) Inc., Bovet Fleurier S.A., MB&F SA, Manufacture Jaeger-LeCoultre SA, Konstantin Chaykin, Alexander Shorokhoff Uhrenmanufaktur GmbH., Greubel Forsey SA: Accused of benefiting from misappropriated trade secrets for product

development and customer engagement, all while being complicit in The Plaintiff's abuse.

7. Glock, Inc., Glock Ges.m.b.H., FN Herstal, Viridian Weapon Technologies, Recover Innovations Inc., Kel-Tec CNC Industries Inc., Boost Toys, Holosun Technologies Inc., Covert Arms HWS ARD, Buck Knives, Inc., PES LASER: Accused of using neural and surveillance-based trade secrets for weapons development and tracking technology, knowing the implications for The Plaintiff.

8. Crunchyroll, LLC., Netflix, Inc., Epic Games, Inc.: Allegedly used The Plaintiff's trade secrets to enhance content creation and audience engagement through RNM technology, with an understanding of the ongoing violations against The Plaintiff.
Summary:
All defendants are accused of acting in concert, utilizing trade secrets obtained through RNM and surveillance technologies, fully aware of the physical and psychological harm inflicted upon the plaintiff for personal, commercial, and technological gain.

Joint Role of Government Entities:
The following government entities are accused of collaborating in a coordinated operation involving illegal surveillance, harassment, and the misappropriation of trade secrets through Remote Neural Monitoring (RNM) technology. Each of these entities is alleged to have been

fully aware of the physical and psychological harm inflicted on The Plaintiff, Mr. Buchanan, which continues to this day.

1. Central Intelligence Agency (CIA): The CIA is accused of developing and supporting advanced surveillance technologies, including RNM, which have been used to monitor and manipulate Mr. Buchanan's thoughts and actions. Their collaboration with private companies to misappropriate The Plaintiff's trade secrets and the orchestration of psychological operations designed to control his perceptions demonstrate a significant breach of ethical and legal standards.

2. Federal Bureau of Investigation (FBI): The FBI is accused of facilitating illegal surveillance operations targeting The Plaintiff. Their involvement allegedly includes monitoring Mr. Buchanan's communications and movements without warrant or justification. The FBI's role in this conspiracy is believed to extend to coordinating with private corporations that have exploited The Plaintiff's trade secrets, effectively aiding in the infringement of his civil rights.

3. United States Drug Enforcement Administration (DEA): The DEA is alleged to have outsourced recruitment efforts to drug cartels to indirectly target Mr. Buchanan for recruitment into various organizations. This recruitment process was reportedly facilitated by RNM

technology, along with documentaries and news broadcasts designed to psychologically influence The Plaintiff. The DEA's involvement raises serious concerns about their methods of operation and disregard for The Plaintiff's well-being.

4. National Security Agency/Central Security Service (NSA/CSS): The NSA is implicated in the development and application of RNM technologies, allegedly providing information and resources to private corporations to conduct illegal surveillance activities against Mr. Buchanan. Their actions are viewed as an infringement upon The Plaintiff's civil liberties and a violation of trust in the use of national security measures.

5. Municipality of Monroeville Police Department: This local law enforcement agency is accused of enabling illegal surveillance practices and coordinating with federal entities to conduct monitoring and harassment against Mr. Buchanan. Their involvement is seen as a betrayal of the public trust, contributing to ongoing violations of The Plaintiff's rights.

6. City of Pittsburgh: The city is alleged to have supported surveillance operations conducted by both law enforcement and private companies, thus facilitating a culture of impunity that has allowed the infringement of Mr. Buchanan's rights to persist. Their lack of oversight has compounded the damages suffered by The Plaintiff.

7. Allegheny Health Network: Allegheny Health Network: Accused of complicity in the misuse of health-related data gathered through RNM, this organization is alleged to have influenced Mr. Buchanan's medical and psychological care detrimentally. Their actions are viewed as part of a broader conspiracy to exploit The Plaintiff's vulnerabilities for commercial and political gain.

### Summary:

These government entities are alleged to have acted in concert with private corporations, knowingly facilitating the misuse of RNM and surveillance technologies, thus contributing to the infringement of The Plaintiff's rights and the ongoing harm inflicted upon them.

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF PENNSYLVANIA

Location Section

This section outlines the various locations where surveillance, remote neural monitoring, and other alleged actions took place, according to the plaintiff's claims.

Residential Locations:

- 1998: 1135 Fox Hill Dr., Monroeville, Pennsylvania 15146
- 2001: 701 Trefoil Ct., Monroeville, Pennsylvania 15146
- 2003/2004: The Alden, 5492 Youngridge Dr., Pittsburgh, Pennsylvania
- 2005/2006: 750 Jones Ave, Turtle Creek, Pennsylvania 15145
- 2007: 750 Jones Ave, Turtle Creek, PA 15145
- 2008: 3952 Monroeville Blvd., Monroeville, Pennsylvania 15146
- 2009: 1145 Fox Hill Dr., Apt 306, Monroeville, Pennsylvania
- 2010/2011: 1135 Fox Hill Dr., Apt 225, Monroeville, Pennsylvania
- 2014/2015: 1145 Fox Hill Dr., Apt 306 / 220 Kenyon St., Turtle Creek, 15145
- 2015/2016: 220 Kenyon St., Apt 220 Turtle Creek, Pennsylvania 15145
- 2017/Present: 3944 Monroeville Blvd., Apt C10, Monroeville, Pennsylvania

Airports and International Locations:

- 2023: Fort Lauderdale International
- 2023: Cancún International Airport, Mexico
- 2023: Washington Dulles International Airport, USA
- 2023: Toronto Pearson International Airport, Canada
- 2023: New York (Port Authority), USA
- 2024: Orlando International Airport, USA
- 2024: Gatwick Airport, UK
- 2024: John Paul II International Airport Kraków—Balice, Poland
- 2024: Barcelona—El Prat Airport, Spain
- 2024: London Stansted Airport, UK
- 2024: Gdańsk Lech Wałęsa Airport, Poland
- 2024: Berlin Brandenburg Airport, Germany
- 2024: Miami International Airport, USA
- 2024: Monseñor Óscar Arnulfo Romero International Airport, El Salvador
- 2024: Cincinnati/Northern Kentucky International Airport, USA
- 2024: Cancún International Airport, Mexico (second visit)
- 2024: Felipe Ángeles International Airport, Mexico
- 2024: Mexico City, Mexico (La Condesa, Centro Historico, and Roma Norte)

- 2024: Adolfo Suárez Madrid—Barajas Airport, Spain
- 2024: Leonardo da Vinci—Fiumicino Airport, Italy
- 2024: Warsaw Chopin Airport, Poland

Train and Bus Stations:

- 2024: Frankfurt (Main) Hbf, Germany
- 2024: Karlsruhe Hbf, Germany
- 2024: Paris Gare de l'Est, France
- 2024: Charles de Gaulle Airport, France
- 2024: John F. Kennedy International Airport, USA
- 2024: Brussels South (Gare du Midi), Belgium
- 2024: Station Prague (Central Bus Station Florenc), Czech Republic

Cities and Regions:

- 2023: Downtown Toronto
- 2024: Mexico City (La Condesa, Centro Historico, Roma Norte)
- 2024: Gdańsk

This list covers the primary locations where the plaintiff claims to have been surveilled or experienced the effects of remote neural monitoring and other illegal actions. The inclusion of international airports and transportation hubs suggests that the surveillance extended beyond residential locations and into international travel.

I. Factual Background

1. Birth Under Extreme Circumstances Due to Remote Neural Monitoring (RNM):

On June 4, 1998, the plaintiff was born under extremely adverse conditions, which were profoundly influenced by the effects of Remote Neural Monitoring (RNM) from the very beginning of their life. During delivery, the plaintiff experienced a critical situation were the umbilical cord was tightly wrapped around their neck, leading to a near-suffocation incident while still in the amniotic sac. This traumatic entrance into the world not only marked the onset of physical and psychological challenges but also exemplifies the significant and invasive impact of RNM technology on the plaintiff's physiological and psychological well-being. The manipulation of the plaintiff's condition during this formative moment indicates a disturbing precedent for continued interference throughout their life, suggesting that RNM was operational even at the earliest stages of their existence.

• Cause of Action: Negligence or Medical Malpractice

• Description: The plaintiff claims that Remote Neural Monitoring (RNM) was used to manipulate his birth, leading to dangerous complications, including the umbilical cord wrapping around his neck, which could establish negligence or malpractice for any responsible parties.

2. Violation of First Amendment Rights:

Mr. Buchanan's freedom of speech and expression has been severely suppressed due to the actions of the defendants involving remote neural monitoring and electronic harassment. This suppression has been ongoing since or before his childhood, with a marked escalation beginning in 2022 and continuing to the present day. The intrusive monitoring and harassment have significantly inhibited his ability to engage in reading, designing, and articulating his opinions freely. Since approximately 2017, these violations have taken place across various locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces within these cities. Additionally, the harassment has extended during both domestic and international travel, further exacerbating the impact on Mr. Buchanan's First Amendment rights and overall ability to express himself without fear or coercion.

• Cause of Action: Violation of Constitutional Rights (42 U.S.C. § 1983)

• Description: The plaintiff alleges that RNM and electronic harassment have suppressed his freedom of speech, impacting his ability to express himself freely, violating his First Amendment rights.

3. Violation of Fourth Amendment Rights:

The defendants have engaged in illegal surveillance practices, including remote neural monitoring and GPS tracking, which infringe upon Mr. Buchanan's reasonable expectation of privacy. This invasive surveillance has been ongoing since or before his childhood, with an intensification of activities occurring since or before 2016 and continuing to the present day. The unauthorized monitoring and harassment have taken place across multiple locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces within these cities. Furthermore, the surveillance activities have persisted during both domestic and international travel, thereby undermining Mr. Buchanan's Fourth Amendment rights and contributing to a pervasive environment of fear and violation of personal privacy.

• Cause of Action: Illegal Search and Seizure (42 U.S.C. § 1983)

• Description: The plaintiff asserts that the defendants engaged in unauthorized surveillance through RNM and GPS tracking, infringing on his reasonable expectation of privacy, thus violating his Fourth Amendment rights.

### 4. Violation of Fifth Amendment Rights:

Through psychological manipulation and the use of remote neural monitoring, the defendants have coerced Mr. Buchanan into self-incrimination, thereby depriving him of his right to due process. This coercive environment has been prevalent from or before 2017 and continues to the present day, significantly impairing his ability to defend himself against allegations. Additionally, the plaintiff experienced related incidents between approximately 2010 and 2016, primarily involving gangstalkers who targeted him, contributing to his compromised position. The monitoring and harassment have occurred in various locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces within these cities. Furthermore, the intrusive activities have extended during domestic and international travel, reinforcing the pervasive nature of the violations against Mr. Buchanan's Fifth Amendment rights and exacerbating the challenges he faces in seeking justice.

• Cause of Action: Violation of Due Process Rights (42 U.S.C. § 1983)

• Description: The plaintiff claims that RNM and psychological manipulation have forced him into self-incrimination, violating his Fifth Amendment rights.

### 5. Violation of Sixth Amendment Rights:

The defendants have obstructed Mr. Buchanan's right to a fair trial by compromising his legal communications and employing tactics of blackmail and coercion to limit his resources. This

obstruction has been ongoing from 2022 to the present day, significantly undermining his ability to engage effectively with legal counsel and to prepare a robust defense. The monitoring and harassment have occurred across various locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces within these cities. These actions not only violate Mr. Buchanan's Sixth Amendment rights but also contribute to an environment of fear and intimidation, further hindering his pursuit of justice and fair treatment within the legal system.

• Cause of Action: Denial of Right to a Fair Trial (42 U.S.C. § 1983)

• Description: The plaintiff alleges that the defendants obstructed his legal communications and limited his resources through blackmail and coercion, infringing on his Sixth Amendment rights.

### 6. Violation of Eighth Amendment Rights:

The defendants have inflicted cruel and unusual punishment on Mr. Buchanan through a pattern of physical and psychological abuse facilitated by remote neural monitoring and electronic harassment. This abuse began at birth and has escalated from childhood to the present day, resulting in significant physical and emotional pain. The monitoring and harassment have occurred in various locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces within these cities. Furthermore, these violations have continued during domestic and international travel, contributing to a pervasive atmosphere of suffering and deprivation. The ongoing nature of this abuse constitutes a clear infringement of Mr. Buchanan's Eighth Amendment rights, highlighting the inhumane treatment he has endured throughout his life.

• Cause of Action: Cruel and Unusual Punishment (42 U.S.C. § 1983)

• Description: The plaintiff contends that the defendants' use of RNM and electronic harassment caused him physical and psychological harm, constituting cruel and unusual punishment in violation of his Eighth Amendment rights.

### 7. Violation of Fourteenth Amendment Rights:

The defendants have systematically targeted and harassed Mr. Buchanan through pervasive surveillance practices, denying him equal protection under the law. This pattern of discrimination has persisted from prenatal development to the present, affecting his life across the United States and during international travel. The monitoring and harassment have occurred at multiple locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces within these cities. Additionally, the violations have extended during

domestic and international travel, further underscoring the comprehensive nature of the discrimination faced by Mr. Buchanan. This systemic harassment and denial of equal protection not only violate his Fourteenth Amendment rights but also contribute to an ongoing atmosphere of fear and inequality, severely impacting his ability to lead a normal life.

• Cause of Action: Equal Protection Violation (42 U.S.C. § 1983)

• Description: The plaintiff asserts that the defendants' surveillance and harassment through RNM denied him equal protection under the law, violating his Fourteenth Amendment rights.

### 8. Invasion of Privacy via Remote Neural Monitoring:

The defendants have unlawfully accessed Mr. Buchanan's private medical records, banking information, and personal data through remote neural monitoring without his consent. This invasion of privacy has caused significant emotional distress, particularly from approximately 2016 to the present day. Mr. Buchanan's experience with remote neural monitoring dates back to his birth on June 4, 1998, indicating a long history of intrusive surveillance. The monitoring and harassment have occurred at multiple locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces within these cities. Moreover, these violations have persisted during both domestic and international travel, exacerbating the emotional impact of the defendant's actions and highlighting a continuous breach of Mr. Buchanan's right to privacy throughout his life.

• Cause of Action: Invasion of Privacy

• Description: The plaintiff claims that the defendants unlawfully accessed his private medical and personal data through RNM, causing emotional distress and violating his right to privacy.

### 9. Data Breach and Unauthorized Access to Electronic Devices:

From approximately 2011 to the present day, the defendants have unlawfully accessed Mr. Buchanan's electronic devices and social media accounts without authorization, resulting in the theft of personal information. This breach of data privacy has led to significant distress and violation of Mr. Buchanan's rights. The monitoring and harassment have occurred in various locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces within these cities. Furthermore, these unauthorized activities have continued during domestic and international travel, further underscoring the pervasive nature of the defendant's violations and the impact on Mr. Buchanan's sense of security and privacy in his personal and professional life.

• Cause of Action: Computer Fraud and Abuse Act (18 U.S.C. § 1030)

• Description: The plaintiff alleges that the defendants unlawfully accessed his electronic devices and social media accounts, stealing personal information, which could be a violation of the Computer Fraud and Abuse Act.

### 10. Manipulation of Physical Appearance through Remote Neural Monitoring:

The government and defendants have treated Mr. Buchanan as if he were a child, employing Remote Neural Monitoring (RNM) to manipulate various aspects of his physical appearance, particularly hair growth. This manipulation involves the creation of artificially induced growth patterns, which serve as a means of psychological control and humiliation. Such actions infringe upon Mr. Buchanan's bodily autonomy and represent a deliberate effort to undermine his identity and sense of self. The use of RNM to alter his physical characteristics not only constitutes a violation of his rights but also perpetuates a harmful dynamic of control that further impacts his psychological well-being and personal dignity.

• Cause of Action: Invasion of Bodily Autonomy

• Description: The plaintiff claims the defendants used RNM to manipulate his physical appearance, infringing on his bodily autonomy and personal dignity.

### 11. Severe Invasion of Privacy and Emotional Distress:

The plaintiff alleges that they were subjected to monitoring while using both private and public bathrooms, resulting in a severe invasion of privacy and significant emotional distress. This invasive surveillance, facilitated through Remote Neural Monitoring (RNM) or other methods, has undermined the plaintiff's sense of safety and security in these intimate settings. The constant awareness of being monitored has led to heightened feelings of vulnerability and anxiety, further exacerbating their emotional distress. This ongoing violation has created a pervasive atmosphere of fear and discomfort, profoundly affecting the plaintiff's mental health and overall quality of life.

• Cause of Action: Invasion of Privacy / Intentional Infliction of Emotional Distress

• Description: The plaintiff alleges that invasive surveillance in bathrooms caused severe emotional distress, constituting an invasion of privacy and emotional trauma.

### 12. Hostile Work Environment:

From approximately 2018 to the present day, the defendants have subjected Mr. Buchanan to remote neural monitoring at his workplace, creating a hostile work environment that has significantly hindered his ability to perform his job effectively. This intrusive surveillance and harassment have taken place at multiple locations, including in Monroeville and Pittsburgh, Pennsylvania. The constant monitoring has not only affected Mr. Buchanan's concentration and productivity but has also contributed to an atmosphere of intimidation and distress, making it difficult for him to maintain his professional responsibilities and well-being in the workplace.

• Cause of Action: Hostile Work Environment

• Description: Description: The plaintiff contends that RNM was used at his workplace, creating a hostile work environment and significantly impairing his ability to perform his duties.

### 13. Misappropriation of Trade Secrets:

The defendants have utilized remote neural monitoring to unlawfully steal Mr. Buchanan's trade secrets, including proprietary ideas related to technology and fashion. This misappropriation has been ongoing from 2012 to the present day. Mr. Buchanan has observed instances of his trade secrets being exploited while at various locations, including his residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces within these cities. Additionally, these violations have occurred during domestic and international travel. The theft of his intellectual property not only constitutes a serious infringement on his rights but also undermines his ability to compete fairly in the market and protect his innovative contributions.

• Cause of Action: Misappropriation of Trade Secrets

• Description: The plaintiff claims that the defendants used RNM to unlawfully steal his proprietary trade secrets, causing significant damage to his business interests.

### 14. Coercion into Criminal Activity:

The defendants allegedly attempted to coerce Mr. Buchanan into joining criminal syndicates through the use of remote neural monitoring and organized stalking. This coercive effort has reportedly been supported by documentaries, news broadcasts, and Netflix series from around 2018 to the present. The monitoring and harassment have occurred on an international scale, with the defendants purportedly collaborating with foreign agencies and criminals globally. Mr. Buchanan has noticed these coercive activities in various locations, including public spaces in Monroeville and Pittsburgh, as well as during domestic and international travel. This manipulation not only poses a significant threat to his safety but also attempts to undermine his

autonomy and integrity, placing him in a vulnerable position regarding potential criminal involvement.

• Cause of Action: Coercion and Duress

• Description: The plaintiff alleges that the defendants attempted to coerce him into criminal activity using RNM and gang stalking, infringing upon his personal autonomy and safety.

### 15. Physical Harm via Remote Neural Monitoring:

The defendants have employed remote neural monitoring in a manner that has resulted in significant physical ailments and disorders for Mr. Buchanan. These conditions include abdominal and lower stomach deformities, erectile dysfunction, Peyronie's disease, involuntary muscle spasms, clammy skin, manipulated drooling, seizures, severe dental issues (including persistent toothaches, cavities, gum disease, and malocclusion), changes in hair texture and growth leading to alopecia, and visual impairments (such as astigmatism, blurry vision, double vision, and eye deformities). This pattern of physical harm has persisted from childhood to the present day. The monitoring and harassment have occurred across multiple locations, including Mr. Buchanan's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces within these areas and during both domestic and international travel. The ongoing physical impact of these actions has severely affected his overall health and quality of life.

• Cause of Action: Personal Injury / Battery

• Description: The plaintiff claims that the defendants' use of RNM caused him various physical ailments, including deformities and erectile dysfunction, constituting personal injury and battery.

### 16. Manipulated Sexual Attraction and Identity:

The plaintiff alleges that they have been subjected to forced attraction to both women and men as a result of sexual triggers employed by the defendants, combined with organized gang stalking facilitated through Remote Neural Monitoring (RNM). This manipulation infringes upon the plaintiff's autonomy and has led to profound confusion and distress regarding their sexual identity and preferences. The orchestrated nature of this targeting intensifies the plaintiff's feelings of violation and psychological harm, as it disrupts their ability to form genuine connections and understand their own desires. This invasive interference not only undermines their personal agency but also contributes to an ongoing sense of turmoil in their emotional and psychological well-being.

• Cause of Action: Invasion of Privacy / Emotional Distress

• Description: The plaintiff alleges that the defendants manipulated his sexual identity through RNM, causing confusion and distress, violating his right to privacy and emotional well-being.

### 17. Non-Consensual Sexual Manipulation:

The defendants have allegedly used pornography and mind control techniques, facilitated by remote neural monitoring, to manipulate the plaintiff into sexual acts without his consent. Additionally, they have employed coercion and induced forced sensations through remote neural monitoring to further compel the plaintiff into engaging in sexual acts against his will. This systematic manipulation not only constitutes a severe violation of the plaintiff's bodily autonomy and consent but also inflicts profound psychological trauma, contributing to ongoing emotional distress and feelings of violation. The pervasive nature of these actions underscores the extent of the defendants' control and manipulation over the plaintiff's sexual experiences and identity.

• Cause of Action: Sexual Battery / Intentional Infliction of Emotional Distress

• Description: The plaintiff claims that the defendants manipulated him into sexual acts without consent through RNM, constituting sexual battery and emotional trauma.

### 18. Publication of Pornographic Videos:

Since or before 2016, the defendants have allegedly created and published pornographic videos intended solely for the plaintiff's viewing. These materials were reportedly designed to brainwash Mr. Buchanan and expose him to mind control techniques, utilizing manipulated content that violated his privacy and dignity. This claim indicates that the defendants' use of such material was part of a broader effort to break down the plaintiff's mental defenses and manipulate his psychological state. The ongoing exposure to this degrading content has contributed to significant emotional distress and a sense of violation, further exacerbating the plaintiff's feelings of helplessness and undermining his personal integrity.

• Cause of Action: Invasion of Privacy / Intentional Infliction of Emotional Distress
Description: The plaintiff claims that the defendants' use of RNM caused him

• Description: The plaintiff alleges that the defendants created and published pornographic videos designed to manipulate and brainwash him, infringing on his privacy and causing emotional harm.

### 19. Creation and Publication of Manipulative Pornographic Material:

The plaintiff alleges that since or before 2016, the defendants have created and published pornographic videos specifically intended for his viewing. These materials are claimed to be designed to brainwash the plaintiff and subject him to mind control techniques. The exposure to this manipulated content is alleged to have violated the plaintiff's privacy and dignity, representing a deliberate effort to undermine his mental defenses and manipulate his psychological state. This systematic targeting has inflicted significant emotional distress and contributed to a pervasive sense of violation, further exacerbating the plaintiff's feelings of helplessness and confusion regarding his identity and autonomy.

• Cause of Action: Defamation / Emotional Distress

• Description: The plaintiff asserts that the defendants created and distributed pornographic materials meant to brainwash him, causing emotional and psychological harm.

20. Collaboration with Musicians to Promote Abuse:

Since or before 2024, the defendants have allegedly collaborated with musicians to promote the sexual abuse that the plaintiff has endured. This collaboration involves creating and recording songs and music videos that endorse and sponsor this abuse. These productions are said to facilitate mind control through Remote Neural Monitoring (RNM) and are intentionally designed to reinforce and normalize the manipulation and control of the plaintiff's behavior and experiences. The use of media in this manner not only contributes to the ongoing abuse but also serves as a means of psychological coercion, further entrenching the plaintiff's victimization. This concerted effort to exploit artistic platforms to perpetuate harm reflects a severe violation of the plaintiff's dignity and autonomy, exacerbating his emotional distress and sense of helplessness.

• Cause of Action: Civil Rights Violations, Defamation, Intentional Infliction of Emotional Distress.

• Brief Description: The plaintiff alleges that since or before 2024, the defendants collaborated with musicians to create and distribute music and videos promoting and endorsing sexual abuse. These productions allegedly facilitate mind control via Remote Neural Monitoring (RNM) and normalize manipulation of the plaintiff's behavior. This media campaign serves as a form of psychological coercion, furthering the abuse and exploitation of the plaintiff, violating his dignity and emotional well-being.

21. Coercion and Manipulation by Government Entities:

The plaintiff alleges that the Drug Enforcement Administration (DEA), in coordination with media broadcasts and other government entities, transmitted hidden messages specifically designed to manipulate him into selling drugs. These covert messages, delivered through various forms of communication, aimed to coerce and pressure the plaintiff into engaging in criminal activities, including drug trafficking. Such actions represent a severe violation of the plaintiff's rights and demonstrate an abusive misuse of governmental authority to induce criminal behavior. This manipulation not only undermines the plaintiff's autonomy but also subjects him to significant emotional distress, as he navigates the psychological repercussions of being targeted by entities that are supposed to protect public safety.

• Cause of Action: Civil Rights Violations, Intentional Infliction of Emotional Distress, Abuse of Power.

• Brief Description: The plaintiff claims that government entities, including the DEA, conspired to manipulate him through hidden messages in media broadcasts, attempting to coerce him into selling drugs. This misuse of governmental authority to induce criminal behavior has caused significant emotional distress and represents a severe violation of the plaintiff's rights, undermining his autonomy and subjecting him to undue psychological pressure.

## 22. Forced Learning and Manipulation of Personal Identifiers:

The plaintiff alleges that he was subjected to forced learning and manipulation concerning numbers and their meanings, specifically related to personal identifiers such as his Social Security number, school ID number, bank account number, and phone number. This manipulation was executed through Remote Neural Monitoring (RNM) techniques, effectively conditioning the plaintiff to associate these numbers with various forms of control and infringement. As a result, these numbers have become tools of psychological manipulation, reinforcing the plaintiff's sense of helplessness and vulnerability. The ongoing conditioning process has led to significant emotional distress, as the plaintiff experiences anxiety and confusion regarding his identity and autonomy, undermining his ability to function normally in daily life.

• Cause of Action: Invasion of Privacy, Intentional Infliction of Emotional Distress, Civil Rights Violations

• Brief Description: The plaintiff alleges that he was subjected to forced learning and manipulation of personal identifiers, such as Social Security and bank account numbers, through RNM. This conditioning process has led to emotional distress and confusion regarding his identity and personal autonomy, as these numbers have become tools for control and psychological manipulation.

## 23. Invasive Surveillance since Prenatal Development:

The defendants have allegedly engaged in constant surveillance of Mr. Buchanan, commencing from prenatal development and continuing to the present day. This invasive monitoring has inflicted severe emotional distress, resulting in significant physical harm, lost business opportunities, and a diminished quality of life. The harassment has occurred across various locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces within these areas and during both domestic and international travel. The ongoing surveillance has not only compromised the plaintiff's sense of security and privacy but has also severely impacted his ability to engage fully in personal, social, and professional activities, contributing to an overarching sense of violation and helplessness throughout his life.

• Cause of Action: Invasion of Privacy, Civil Rights Violations, Intentional Infliction of Emotional Distress

• Brief Description: The plaintiff alleges that invasive surveillance began during his prenatal development and continues to the present. This monitoring has inflicted severe emotional distress and physical harm, damaging his personal and professional life. The pervasive nature of this surveillance has deprived the plaintiff of privacy, security, and the ability to fully engage in daily activities.

## 24. Physical Ailments from Defective Surveillance Equipment:

The plaintiff alleges that defective surveillance equipment employed by the defendants emitted harmful radiation, resulting in radiation burns and various other physical ailments. This harmful exposure has reportedly occurred from approximately mid-2022 to the present day. The monitoring and harassment linked to this defective equipment have taken place at multiple locations, including the plaintiff's residences in Monroeville and in public spaces within both Monroeville and Pittsburgh, as well as during domestic and international travel. The physical harm experienced by Mr. Buchanan due to this radiation exposure has compounded his ongoing distress, further infringing upon his health and well-being.

• Cause of Action: Personal Injury, Negligence, Product Liability

• Brief Description: The plaintiff claims that defective surveillance equipment used by the defendants emitted harmful radiation, causing radiation burns and other physical ailments from mid-2022 to the present. The harmful exposure occurred in various locations, contributing to the plaintiff's physical and emotional suffering and violating his right to health and safety.

25. False Imprisonment through GPS, Coercion, and Blackmail:

The plaintiff alleges that the defendants engaged in false imprisonment by using remote neural monitoring and psychological manipulation to confine Mr. Buchanan to specific locations, thereby restricting his freedom of movement. This coercive behavior reportedly began in approximately 2023 and continues to the present day. The monitoring and harassment associated with this confinement have taken place at various locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, in public spaces within both Monroeville and Pittsburgh, as well as during domestic and international travel. The impact of this confinement has led to significant emotional distress and a profound sense of entrapment for Mr. Buchanan, further infringing upon his civil liberties.

• Cause of Action: False Imprisonment, Civil Rights Violations, Intentional Infliction of Emotional Distress

• Brief Description: The plaintiff alleges that, starting in 2023, the defendants used RNM and psychological manipulation to confine him to specific locations, restricting his freedom of movement. This false imprisonment has caused significant emotional distress and feelings of entrapment, violating his civil liberties and contributing to his ongoing victimization.

26. Organized Stalking and Remote Neural Monitoring:

The plaintiff alleges that the defendants participate in organized stalking, utilizing Remote Neural Monitoring (RNM) technology, which includes GPS tracking of Mr. Buchanan. This coordinated effort allegedly leads the plaintiff into confrontational situations designed to provoke fear and induce self-incrimination. This pattern of monitoring and harassment has reportedly continued from 2017 to the present, taking place in various locations, including Monroeville and Pittsburgh, Pennsylvania, as well as during domestic and international travel. The plaintiff asserts that this systemic harassment has severely impacted his emotional well-being and overall quality of life, further contributing to a pervasive sense of vulnerability and distress.

• Cause of Action: Invasion of Privacy, Intentional Infliction of Emotional Distress, Civil Rights Violations

• Brief Description: The plaintiff claims that, since 2017, the defendants have participated in organized stalking, using RNM technology and GPS tracking to provoke confrontational situations designed to induce fear and self-incrimination. This systemic harassment has deeply affected the plaintiff's emotional well-being and quality of life, causing pervasive fear and distress.

## 27. Misappropriation of Intellectual Property:

The plaintiff alleges that the defendants have misappropriated Mr. Buchanan's intellectual property from 2012 to the present day through illegal surveillance. This misappropriation has purportedly allowed the defendants to benefit from Mr. Buchanan's innovations across various industries. The monitoring and harassment related to these actions occurred at multiple locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, in addition to public spaces within these areas, as well as during domestic and international travel. The plaintiff claims that this ongoing infringement has resulted in significant personal and professional harm, undermining his contributions and intellectual rights.

• Cause of Action: Intellectual Property Infringement, Civil Rights Violations, Unjust Enrichment

• Brief Description: The plaintiff alleges that the defendants have misappropriated his intellectual property from 2012 to the present via illegal surveillance. This infringement has allowed the defendants to benefit from his innovations, resulting in significant professional harm and undermining his intellectual contributions across various industries.

## 28. Harassment via Telephone:

The plaintiff alleges that the defendants have engaged in harassment through repeated, unwanted phone calls directed at Mr. Buchanan from about or before 2022 to the present day. This harassment has caused him significant distress and anxiety. The monitoring and harassment have occurred at multiple locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as during international travel. The plaintiff asserts that these actions constitute a deliberate effort to disrupt his peace and well-being, further exacerbating his emotional and psychological challenges.

• Cause of Action: Intentional Infliction of Emotional Distress (IIED)

• Brief Description: The plaintiff alleges continuous and repeated harassing phone calls from the defendants since 2022. The unwanted communication caused significant distress, exacerbating his emotional and psychological well-being. This harassment took place across multiple residences and international travel locations.

## 29. Denial of Asylum and Continued Harassment:

The plaintiff, Diamond Buchanan, applied for asylum at YYZ Airport in Toronto in an attempt to escape relentless harassment. Despite this effort, the plaintiff continued to endure torture, sexual

abuse, and gang stalking (organized stalking) both during and after the asylum application process. At that time, the plaintiff was unaware of the existence of Remote Neural Monitoring (RNM) technology, which facilitated this ongoing abuse. This situation represents a severe violation of the plaintiff's rights and underscores the continuous and systematic nature of the harassment faced, illustrating the challenges in seeking refuge from such pervasive mistreatment.

• Cause of Action: Violation of International Human Rights Law

• Brief Description: Plaintiff alleges that after seeking asylum in Toronto to escape harassment, he continued to experience torture, abuse, and gangstalking, compounded by the use of Remote Neural Monitoring (RNM). This denial of protection from persecution highlights the inability to escape systematic harassment.

## 30. Surveillance during Travel:

Since April 11, 2023, the defendants have conducted constant surveillance of Mr. Buchanan during his international travel, resulting in significant emotional distress and a severe invasion of privacy. This intrusive monitoring and harassment have occurred at various locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces within these areas and during domestic and international travel. The ongoing surveillance has further compounded the plaintiff's sense of vulnerability and fear while traveling.

• Cause of Action: Invasion of Privacy (Intrusion Upon Seclusion)

• Brief Description: Since April 2023, the plaintiff has been under constant surveillance during international travel, which significantly impacted his privacy and caused emotional distress. The plaintiff claims that the surveillance continued at residences and public spaces in Monroeville and Pittsburgh, as well as during domestic and international travel.

## 31. Physical Assault in Frankfurt:

On March 8, 2024, Mr. Buchanan was physically assaulted by individuals acting on behalf of the defendants after being forcibly removed from the airport during his travel in Frankfurt, Germany. This incident not only caused physical harm but also exacerbated the plaintiff's ongoing emotional distress and feelings of vulnerability, further illustrating the defendants' coordinated efforts to harass and intimidate him during his travels.

• Cause of Action: Assault and Battery

• Brief Description: On March 8, 2024, the plaintiff was physically assaulted by individuals connected to the defendants at Frankfurt Airport. The assault caused physical injury and emotional trauma, further exemplifying the coordinated harassment during travel.

32. Participation of Local Police (International Police) Departments and Airport Security:

The plaintiff, Diamond Buchanan, has been subjected to harassment and illegal monitoring by various local and international police departments, as well as airport security forces, during his travels. The plaintiff alleges that these law enforcement agencies and security personnel collaborated with the defendants in surveilling and intimidating him through remote neural monitoring, physical searches, and psychological manipulation, constituting severe violations of his rights. The incidents occurred at various international airports and cities from 2023 to the present day. The specific locations and police/security forces involved include:

1.     San Salvador, El Salvador: National Civil Police (Policía Nacional Civil) and El Salvador International Airport Police.
2.     Cancun, Mexico: National Guard (Guardia Nacional), Cancun Municipal Police (Policía Municipal de Cancún), and Cancun International Airport Police.
3.     Mexico City, Mexico: Secretariat of Citizen Security (Secretaría de Seguridad Ciudadana), Mexico City Police (Policía de la Ciudad de México), and Mexico City International Airport Police.
4.     London, United Kingdom: Heathrow Airport Police.
5.     Stansted, United Kingdom: Stansted Airport Police.
6.     Rome, Italy: Leonardo da Vinci–Fiumicino Airport Police.
7.     Gdańsk, Poland: Gdańsk Municipal Police (Straż Miejska w Gdańsku), Gdańsk Lech Wałęsa Airport Police, and Polish Border Guard (Straż Graniczna).
8.     Warsaw, Poland: Warsaw Municipal Police (Straż Miejska m.st. Warszawy) and Warsaw Chopin Airport Police.
9.     Krakow, Poland: John Paul II Kraków-Balice International Airport Police.
10.     Barcelona, Spain: Barcelona Municipal Police (Guardia Urbana de Barcelona) and Barcelona-El Prat Airport Police.
11.     Madrid, Spain: Adolfo Suárez Madrid–Barajas Airport Police.
12.     Prague, Czech Republic: Prague Municipal Police (Městská policie Praha) and Václav Havel Airport Prague Police.
13.     Paris, France: National Police (Police Nationale), Paris Municipal Police (Police Municipale de Paris), and Charles de Gaulle Airport Police.
14.     Berlin, Germany: Berlin Police (Polizei Berlin) and Berlin Brandenburg Airport Police.
15.     Frankfurt, Germany: Frankfurt Police (Polizei Frankfurt am Main) and Frankfurt Airport Police.

16.    New York City, USA: John F. Kennedy International Airport Police, TSA, and U.S. Customs.

17.    Miami, USA: Miami-Dade Police Department, TSA, and Miami International Airport Police.

18.    Orlando, USA: Department of Homeland Security (DHS) and Orlando International Airport Police.

These agencies allegedly participated in illegal surveillance, including torture, physical searches, sexual abuse, assault, battery, negligence, coercion into criminal activity, invasion of privacy, unauthorized data breaches, harassment, and threats of imprisonment. These actions were part of a coordinated and overarching conspiracy involving illegal surveillance, psychological harassment, and physical searches, often coordinating with other parties involved in the overarching conspiracy against Mr. Buchanan. The actions described have led to significant violations of his civil liberties, including his right to privacy, freedom from unreasonable search and seizure, and freedom of movement.

• Cause of Action: Civil Rights Violations / Unlawful Surveillance

• Brief Description: The plaintiff alleges that various international police departments and airport security forces collaborated with the defendants to engage in illegal surveillance, physical searches, and psychological manipulation. These actions violated the plaintiff's privacy and civil liberties, causing ongoing psychological harm.

33. Unlawful Tracking & Mind Reading:

From childhood to the present day, the defendants have allegedly utilized Remote Neural Monitoring (RNM) technology to unlawfully track the plaintiff, Diamond Buchanan, in real-time and intercept his thoughts, thereby violating his right to privacy. This invasive monitoring reportedly intercepts and responds to the plaintiff's mental processes through various media platforms, including televisions, social media, and global communications. The monitoring and harassment occurred at multiple locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces within these cities and during domestic and international travel. This ongoing violation has caused significant emotional distress and a profound sense of vulnerability for the plaintiff.

• Cause of Action: Violation of Privacy / Unauthorized Surveillance

• Brief Description: The defendants are accused of using RNM technology since the plaintiff's childhood to track him and intercept his thoughts. This has caused significant emotional distress due to the invasion of privacy and monitoring of personal mental processes.

34. Technological Harassment:

Since approximately 2004 to the present day, the defendants have allegedly employed advanced technology, including audio and video surveillance, GPS tracking, and Directed Energy Weapons (DEWs), to remotely harass and monitor the plaintiff, Diamond Buchanan. This harassment reportedly involves voice morphing, synthetic voice generation, and the broadcasting of manipulated voices over various devices, creating a distressing and invasive experience for the plaintiff. The monitoring and harassment have occurred at multiple locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces within these cities and during international travel. This systematic use of technology has contributed significantly to the plaintiff's emotional distress and sense of violation.

• Cause of Action: Intentional Infliction of Emotional Distress (IIED)

• Brief Description: From 2004 onward, the plaintiff claims that the defendants utilized various forms of technology, such as Directed Energy Weapons (DEWs), audio, and video surveillance, to harass him. The use of synthetic voices and manipulated audio contributed to a pervasive sense of harassment.

35. Voice Morphing/Cloning:

From approximately 2021 to the present day, the defendants have allegedly utilized remote neural monitoring technology to clone or morph the plaintiff's voice in real-time over various public and private audio systems. This technology is claimed to replicate any voice, including that of actors, and has been allegedly employed to undermine the plaintiff's self-esteem by forcing manipulated vocalizations since around 2013. The monitoring and harassment have occurred at multiple locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces within these areas and during domestic and international travel. This invasive practice has significantly impacted the plaintiff's psychological well-being and sense of identity.

• Cause of Action: Invasion of Privacy / Unauthorized Use of Identity

• Brief Description: Since 2021, the plaintiff alleges that the defendants have employed RNM to clone or manipulate his voice in public and private settings, causing harm to his identity and self-esteem. The morphing reportedly undermined his sense of personal agency and caused distress.

36. Hearing Capability (Eavesdropping and Forced Auditory Manipulation):

Since approximately 2011, the defendants have allegedly utilized Remote Neural Monitoring (RNM) technology to eavesdrop on the plaintiff's private conversations and surrounding environments without consent. This invasive surveillance includes forcing the plaintiff to hear specific broadcasts, music, and conversations, which are designed to insult and humiliate him. This deliberate targeting has resulted in significant psychological harm and distress. The monitoring and harassment have occurred at multiple locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces within these areas and during domestic and international travel. The ongoing auditory manipulation has severely affected the plaintiff's mental health and overall quality of life.

• Cause of Action: Invasion of Privacy (Wiretapping / Eavesdropping)

• Brief Description: Beginning in 2011, the plaintiff claims that RNM technology was used to eavesdrop on his private conversations without consent and to manipulate his auditory environment, leading to severe psychological harm.

### 37. Directed Energy Assaults (Most Recent):

Since approximately 2022, the plaintiff has allegedly been subjected to physical assaults using Directed Energy Weapons (DEWs), which have resulted in shocks, burns, and long-term health effects. These assaults are reportedly facilitated through Remote Neural Monitoring (RNM) technology by the defendants. The monitoring and harassment have occurred at multiple locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces within these areas and during domestic and international travel. The ongoing use of DEWs has inflicted significant physical harm and contributed to the plaintiff's deteriorating health, further exacerbating the distress caused by the defendants' actions.

• Cause of Action: Assault and Battery

• Brief Description: Since 2022, the plaintiff alleges that Directed Energy Weapons (DEWs) were used to physically assault him, causing burns, shocks, and other injuries. These ongoing assaults caused both physical harm and emotional distress.

### 38. Control of Sleep Patterns:

Since approximately 2022, the defendants have allegedly employed Remote Neural Monitoring (RNM) technology to interfere with the plaintiff's sleep patterns, often utilizing Directed Energy Weapons (DEWs) to induce sleep deprivation and various health issues. This manipulation has led to significant emotional and physical distress for the plaintiff. The monitoring and

harassment have occurred at multiple locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces within these areas and during domestic and international travel. The interference with sleep has negatively impacted the plaintiff's overall well-being and quality of life.

• Cause of Action: Intentional Infliction of Emotional Distress (IIED)

• Brief Description: The defendants allegedly used RNM and DEWs to manipulate the plaintiff's sleep patterns, inducing sleep deprivation and causing health issues. This interference caused severe physical and emotional stress for the plaintiff.

39. Computer-to-Brain Interface (Thought Control and Memory Retrieval):

From approximately 2012 to the present day, the defendants have allegedly utilized Remote Neural Monitoring (RNM) technology that interfaces directly with the plaintiff's brain. This manipulation reportedly includes controlling the plaintiff's thoughts, retrieving personal memories, and implanting new personalities. The ongoing interference has caused significant psychological distress, altering the plaintiff's sense of self and personal identity. The monitoring and harassment have taken place in various locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces and during domestic and international travel.

• Cause of Action: Violation of Privacy / Cognitive Liberty

• Brief Description: The plaintiff alleges that since 2012, the defendants have used RNM to control his thoughts and retrieve personal memories, violating his mental autonomy and privacy, leading to significant psychological trauma.

40. Organized Stalking & Thought Monitoring:

Since approximately 2001 to the present day, the defendants have allegedly orchestrated a campaign of organized stalking against the plaintiff, utilizing Remote Neural Monitoring (RNM) technology to monitor and control his thoughts. This campaign reportedly involves coordinated harassment efforts designed to intimidate and manipulate the plaintiff, contributing to his emotional distress and loss of autonomy. The monitoring and harassment have occurred at various locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces and during domestic and international travel.

• Cause of Action: Stalking / Harassment

• Brief Description: The defendants allegedly engaged in a prolonged campaign of organized stalking and thought monitoring, using RNM to intimidate and manipulate the plaintiff, causing emotional and psychological harm.

### 41. Electronic Disturbances (Interference with Devices):

Since approximately 2004 to the present day, the defendants have allegedly used Remote Neural Monitoring (RNM) technology to cause electronic disturbances that disrupt the plaintiff's daily life. These disturbances include flickering lights, odd noises from appliances, and interference with televisions and radios. The monitoring and harassment have occurred across multiple locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces and during domestic and international travel.

• Cause of Action: Intentional Infliction of Emotional Distress (IIED)

• Brief Description: The plaintiff claims that RNM technology was used to interfere with electronic devices in his environment, causing disruptions in his daily life and contributing to his distress since 2004.

### 42. Microwave Hearing or Synthetic Telepathy:

Since approximately 2004 to the present day, the defendants have allegedly utilized Remote Neural Monitoring (RNM) technology to force the plaintiff to hear his own voice or audio cues, which are employed in conjunction with organized stalking to harass him. This includes persistent ringing or tones in the plaintiff's ears. The monitoring and harassment have occurred across multiple locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces and during domestic and international travel.

• Cause of Action: Torture / Violation of Human Rights

• Brief Description: Since 2004, the plaintiff alleges that RNM technology was used to force him to hear synthetic telepathic transmissions, causing psychological distress through constant auditory harassment.

### 43. Visual and Auditory Hallucinations (Induced by RNM):

Since approximately 2017 to the present day, the plaintiff alleges that the defendants have utilized Remote Neural Monitoring (RNM) technology to induce visual and auditory hallucinations. This includes instances where the plaintiff is unable to see objects that are actually present or experiences false visual and auditory stimuli. The monitoring and harassment

have occurred across multiple locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces and during domestic and international travel.

• Cause of Action: Intentional Infliction of Emotional Distress (IIED)

• Brief Description: The plaintiff alleges that since 2017, the defendants have used RNM technology to induce false visual and auditory stimuli, further contributing to his psychological distress.

## 44. Remote Physical Manipulation:

Since approximately 2017 to the present day, the defendants are alleged to have utilized Remote Neural Monitoring (RNM) technology to remotely control or manipulate the plaintiff's physical sensations. This manipulation includes, but is not limited to, sensations of itching, control over hand movements, muscle quaking, deep-tissue sensations, forced orgasms, and the movement of body parts. The monitoring and harassment have occurred at multiple locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces and during domestic and international travel.

• Cause of Action: Battery / Torture

• Brief Description: The plaintiff alleges that RNM technology was used to manipulate his physical sensations, including forced movements and deep-tissue sensations, causing significant emotional and physical harm.

## 45. Thought Parroting & Directed Conversations:

Since about or before 2015 to the present day, the defendants have engaged in organized stalking efforts that involve mimicking the plaintiff's thoughts and injecting conversations into radios or TVs that directly reference those thoughts. This tactic is intended as a form of psychological harassment. The monitoring and harassment have occurred at multiple locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces and during domestic and international travel.

• Cause of Action: Harassment / Stalking

• Brief Description: The plaintiff claims that since 2015, the defendants have been using RNM technology to mimic his thoughts and inject them into surrounding conversations and media, resulting in psychological harassment.

46. Remote Behavioral Control:

Since about 2017 to the present day, the defendants have allegedly used Remote Neural Monitoring (RNM) to manipulate the plaintiff's actions and emotions, potentially implanting specific commands or behaviors without the plaintiff's consent. The monitoring and harassment have occurred at multiple locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces and during domestic and international travel.

• Cause of Action: Violation of Autonomy / Coercion

• Brief Description: The plaintiff alleges that the defendants have used RNM technology to remotely control his behavior, leading to a loss of autonomy and causing him significant distress.

47. Long-Term Health Risks:

Since approximately 2022 to the present day, the defendants' prolonged use of Remote Neural Monitoring (RNM) technologies, including microwaves and electromagnetic radiation, has been causing serious long-term health risks to the plaintiff. The monitoring and harassment have occurred at multiple locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces and during domestic and international travel.

• Cause of Action: Negligence, Personal Injury, Civil Rights Violations

• Brief Description: The plaintiff alleges that since 2022, the defendants' use of Remote Neural Monitoring (RNM) technologies, including microwaves and electromagnetic radiation, has caused serious long-term health risks, such as radiation exposure. The ongoing monitoring at the plaintiff's residences and during travel has led to physical harm and significantly affected the plaintiff's overall well-being, violating his health rights and safety protections.

48. Psychological Warfare:

Since approximately 2012 to the present day, the defendants have been using Remote Neural Monitoring (RNM) technology as part of a psychological warfare campaign aimed at destabilizing the plaintiff's mental health, resulting in feelings of isolation and vulnerability. The monitoring and harassment have occurred at multiple locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces and during domestic and international travel.

• Cause of Action: Intentional Infliction of Emotional Distress, Civil Rights Violations, Harassment

• Brief Description: The plaintiff claims that since 2012, the defendants have used RNM technology to engage in psychological warfare designed to destabilize his mental health. This prolonged harassment has caused emotional distress and feelings of isolation. The monitoring has taken place in the plaintiff's residences and other locations, creating a hostile and oppressive environment that violates the plaintiff's mental and emotional well-being.

49. Illegal Surveillance (No Warrant, Unauthorized Monitoring):

Since prenatal development to the present day, the defendants have used Remote Neural Monitoring (RNM) technology without a warrant, conducting unauthorized surveillance on the plaintiff. This practice violates his privacy rights and constitutes illegal searches. The monitoring and harassment have occurred at multiple locations, including the plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, as well as in public spaces and during domestic and international travel.

• Cause of Action: Invasion of Privacy, Civil Rights Violations, Illegal Search and Seizure

• Brief Description: The plaintiff alleges that since his prenatal development, the defendants have used RNM technology to conduct unauthorized and warrantless surveillance, violating his privacy and constitutional rights. This illegal monitoring, occurring at his residences and during travel, represents an ongoing violation of the plaintiff's right to be free from unlawful searches and invasions of privacy.

50. Corruption and Racketeering (Organized Criminal Activities):

Government officials have allegedly engaged in organized criminal activities, including drug trafficking, facilitated through Remote Neural Monitoring (RNM) technology. This conduct constitutes violations of federal laws, including those outlined in the Racketeer Influenced and Corrupt Organizations (RICO) Act. The actions of these officials further exacerbate the ongoing violations of the plaintiff's rights and safety.

• Cause of Action: Racketeering (RICO), Corruption, Civil Rights Violations

• Brief Description: The plaintiff claims that government officials are involved in organized criminal activities, including drug trafficking, facilitated through RNM technology. These actions violate federal laws, including the Racketeer Influenced and Corrupt Organizations (RICO) Act,

and further contribute to the abuse and exploitation of the plaintiff. This organized corruption exacerbates the ongoing violations of the plaintiff's rights and personal safety.

### 51. Fraudulent Health Claims (Deceptive Use of RNM):

Since approximately 2007, with a significant escalation starting in 2015 and continuing to the present day, the Defendants have allegedly employed fraudulent health claims, including diagnoses of asthma, psychosis, schizophrenia, depression, and anxiety, to conceal the use of Remote Neural Monitoring (RNM) technology on The Plaintiff. This deceptive practice aimed to exploit and harm The Plaintiff while obscuring the true nature of the remote neural monitoring being utilized. The monitoring and harassment occurred at multiple locations, including The Plaintiff's residences in Monroeville and Pittsburgh, Pennsylvania, in addition to public spaces and during both domestic and international travel.

• Cause of Action: Fraud, Intentional Infliction of Emotional Distress, Civil Rights Violations

• Brief Description: The plaintiff alleges that since 2007, with escalation beginning in 2015, the defendants made fraudulent health claims, diagnosing him with conditions like asthma, psychosis, and schizophrenia, to conceal the use of RNM technology. These false diagnoses aimed to exploit and harm the plaintiff while obscuring the true nature of the monitoring. The prolonged psychological and physical harm has occurred at multiple locations, including the plaintiff's residences and during travel.

# INTRODUCTION

Introduction to Section 6 of the SF-95

This claim arises from injuries and harm sustained as a direct result of the actions of federal employees and agencies engaged in unlawful surveillance and other tortious conduct. Specifically, the claimant, Diamond Buchanan, has been subjected to long-term unauthorized monitoring, harassment, and physical harm resulting from the misuse of government technology. These actions have caused severe physical and emotional distress, as well as significant financial and personal losses.

The government employees involved, acting within the scope of their employment, have used advanced technology to inflict harm, violate privacy, and interfere with daily life. The ongoing nature of these actions has exacerbated the claimant's suffering, resulting in medical expenses, loss of income, and lasting physical and psychological damage. This claim seeks appropriate compensation for the harm endured.

Description of Incident

"The incident began on June 4, 1998, and is ongoing. It involves persistent harassment and surveillance through Remote Neural Monitoring (RNM) technology, including manipulation, emotions, and physical sensations. I have been subjected to psychological and physical harm, including forced pain, induced medical conditions, and severe emotional distress, due to the actions of various defendants, including government entities and private corporations. This continuous targeting has significantly impacted my quality of life and well-being."

# STANDARD FORM 95

## I. Defendants Joint Operation:

1. I. Factual Background: The Defendants listed in this complaint have acted jointly and in concert to carry out the alleged violations of The Plaintiff's rights. Each Defendant, through direct or indirect involvement, has participated in a coordinated effort to use remote neural monitoring and electronic harassment technologies against The Plaintiff. This joint operation involved the systematic and continuous use of advanced surveillance technologies, including but not limited to remote neural monitoring, GPS tracking, and electronic harassment, to invade the Plaintiff's privacy, inflict physical and psychological harm, and manipulate the Plaintiff's thoughts, actions, and environment.

2. Coordination and Conspiracy: The Defendants have collaborated in a manner that suggests a conspiracy to infringe upon The Plaintiff's constitutional and civil rights. This joint operation has manifested through shared resources, technology, and information, contributing to a pervasive and coordinated scheme to monitor, control, and harass The Plaintiff. The joint efforts include, but are not limited to, the use of surveillance equipment, coordinated harassment tactics, and the unlawful dissemination and exploitation of The Plaintiff's private information and trade secrets.

3. Liability: As a result of their joint operation, each Defendant is jointly and severally liable for the harm inflicted upon The Plaintiff. The Defendants' collective actions have led to The Plaintiff's suffering and have compounded the damages resulting from the alleged violations of The Plaintiff's rights.

## II. Nature of the Case:

1. Overview: This case involves a complex and coordinated scheme of surveillance, harassment, and manipulation perpetrated by The Defendants using advanced technologies such as remote neural monitoring, electronic harassment, and other invasive surveillance methods. The Plaintiff alleges that these actions constitute severe violations of constitutional rights, including the right to privacy, freedom of speech, and protection from cruel and unusual punishment.

2. Scope of the Allegations: The Plaintiff claims that The Defendants, through their joint operation, have inflicted significant physical and psychological harm. This includes unauthorized surveillance of personal information, including medical records and communications, forced participation in sexual activities, manipulation through psychological and electronic means, and intentional infliction of emotional and physical distress. The Defendants actions have led to violations of The Plaintiff's First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights, as well as various torts related to privacy and emotional distress.

3. Impact on The Plaintiff: The Plaintiff has suffered severe and ongoing harm as a result of The Defendants' actions. This harm includes physical ailments, emotional distress, loss

of privacy, and a substantial disruption to The Plaintiff's personal and professional life. The Plaintiff seeks redress for these violations through this legal action, aiming to hold The Defendants accountable and to obtain appropriate relief for the extensive damages suffered.

## III. Basis of Claim

1.      Birth Under Extreme Circumstances Due to Remote Neural Monitoring (RNM): The plaintiff experienced adverse health conditions during pregnancy directly linked to the use of RNM technology.

2.      Violation of First Amendment Rights: The plaintiff's freedom of speech and expression was impeded through surveillance and harassment, infringing upon constitutional rights.

3.      Violation of Fourth Amendment Rights: The plaintiff faced unreasonable searches and seizures through unauthorized surveillance, violating their constitutional protections.

4.      Violation of Fifth Amendment Rights: The plaintiff was denied due process through government actions that infringed upon their rights without fair legal procedures.

5.      Violation of Sixth Amendment Rights: The plaintiff's right to a fair trial was compromised by undue influence and manipulation from external parties.

6.      Violation of Eighth Amendment Rights: The plaintiff suffered cruel and unusual punishment through the infliction of pain and suffering via RNM technologies.

7.      Violation of Fourteenth Amendment Rights: The plaintiff was denied equal protection under the law through discriminatory practices and targeted harassment.

8.      Invasion of Privacy via Remote Neural Monitoring: The plaintiff's right to privacy was breached through unauthorized monitoring of their thoughts and actions.

9.      Data Breach and Unauthorized Access to Electronic Devices: The plaintiff's electronic devices were accessed without consent, resulting in the theft of personal information.

10.      Severe Invasion of Privacy and Emotional Distress: The plaintiff endured significant emotional distress due to continuous invasions of privacy and harassment.

11.      Hostile Work Environment: The plaintiff was subjected to a work environment that was intimidating and hostile, leading to adverse psychological effects.

12.      Misappropriation of Trade Secrets: The defendants unlawfully acquired and used the plaintiff's proprietary information for their own gain.

13.      Coercion into Criminal Activity: The plaintiff was compelled to engage in illegal activities through threats and manipulation by the defendants.

14.      Physical Harm via Remote Neural Monitoring: The plaintiff suffered physical injuries and ailments as a result of harmful RNM practices.

15.      Manipulated Sexual Attraction and Identity: The plaintiff's sexual identity and preferences were manipulated without consent, leading to confusion and distress.

16.      Non-Consensual Sexual Manipulation: The plaintiff experienced sexual activities induced by external influences without their consent.

17.     Publication of Pornographic Videos: The plaintiff's image or likeness was exploited in non-consensual pornographic material, leading to reputational harm.

18.     Creation and Publication of Manipulative Pornographic Material: The plaintiff was targeted with manipulative pornographic content aimed at psychological control.

19.     Collaboration with Musicians to Promote Abuse: The plaintiff's personal experiences were exploited in artistic works without consent, leading to emotional harm.

20.     Coercion and Manipulation by Government Entities: The plaintiff faced undue pressure and manipulation from government entities, infringing upon their rights.

21.     Forced Learning and Manipulation: The plaintiff was subjected to coercive educational practices that undermined their autonomy and well-being.

22.     Invasive Surveillance Since Prenatal Development: The plaintiff's right to privacy was compromised from before birth through unauthorized surveillance.

23.     Physical Ailments from Defective Equipment: The plaintiff suffered injuries due to the use of defective or harmful equipment, violating safety standards.

24.     False Imprisonment: The plaintiff was unlawfully detained or restricted in their movements against their will.

25.     Organized Stalking and RNM: The plaintiff was the target of coordinated stalking efforts that utilized RNM technologies to instill fear and anxiety.

26.     Misappropriation of Intellectual Property: The defendants unlawfully used the plaintiff's intellectual property, causing financial and reputational harm.

27.     Harassment via Telephone: The plaintiff was subjected to persistent harassment through unwanted telephone communications.

28.     Denial of Asylum and Continued Harassment: The plaintiff faced threats and harassment after being denied asylum, impacting their safety and well-being.

29.     Surveillance During Travel: The plaintiff experienced unauthorized surveillance while traveling, violating their privacy rights.

30.     Physical Assault in Frankfurt: The plaintiff was physically assaulted, resulting in injuries and emotional trauma during travel.

31.     Unlawful Tracking & Mind Reading: The plaintiff was subjected to unauthorized tracking and invasive mental intrusion that violated their rights.

32.     Technological Harassment: The plaintiff faced emotional distress and harassment due to the malicious use of technology by the defendants.

33.     Voice Morphing/Cloning: The plaintiff's voice was manipulated or cloned without consent, leading to identity theft and reputational damage.

34.     Hearing Capability: The plaintiff's ability to hear was compromised due to external interference, impacting their quality of life.

35.     Directed Energy Assaults: The plaintiff suffered physical injuries as a result of assaults using directed energy technologies.

36.     Control of Sleep Patterns: The plaintiff's natural sleep patterns were manipulated, leading to significant health issues.

37.     Computer-to-Brain Interface: The plaintiff's brain was interfaced with external technology without consent, leading to psychological and physical harm.

38.     Organized Stalking & Thought Monitoring: The plaintiff faced psychological harassment through systematic stalking and monitoring of their thoughts.

39.     Electronic Disturbances: The plaintiff experienced distress due to unauthorized and disruptive electronic interferences.

40.     Microwave Hearing/Synthetic Telepathy: The plaintiff was subjected to auditory hallucinations caused by microwave technology, leading to psychological distress.

41.     Visual and Auditory Hallucinations: The plaintiff experienced manipulated sensory perceptions due to external technological interventions.

42.     Remote Physical Manipulation: The plaintiff's physical movements were influenced without consent, violating personal autonomy.

43.     Thought Parroting & Directed Conversations: The plaintiff's thoughts were mimicked or used in conversations without their consent, causing emotional distress.

44.     Remote Behavioral Control: The plaintiff's behavior was controlled by external influences without their knowledge or consent.

45.     Long-Term Health Risks: The plaintiff faces serious health risks due to ongoing exposure to harmful technologies.

46.     Psychological Warfare: The plaintiff endured psychological manipulation tactics that caused significant emotional and mental distress.

47.     Corruption and Racketeering: The defendants engaged in corrupt practices that violated laws against organized crime and corruption.

48.     Fraudulent Health Claims: The plaintiff was misled by fraudulent health claims that caused harm and financial loss.

IV. Nature of the Damage

1.     Birth Under Extreme Circumstances Due to Remote Neural Monitoring (RNM): Lifelong physical, emotional, and developmental harm, including chronic health issues and psychological trauma.

2.     Violation of First Amendment Rights: Severe emotional distress and suppression of free expression, resulting in the stifling of creative and intellectual potential.

3.     Violation of Fourth Amendment Rights: Continuous illegal surveillance has caused a profound invasion of privacy, leading to emotional distress, chronic anxiety, and a diminished sense of personal security.

4.     Violation of Fifth Amendment Rights: Psychological manipulation, loss of autonomy, and emotional trauma due to the deprivation of due process.

5.     Violation of Sixth Amendment Rights: Emotional harm from obstruction of legal rights, creating feelings of helplessness and despair.

6.      Violation of Eighth Amendment Rights: Physical and psychological torture caused by RNM, including physical pain, emotional suffering, and long-term psychological damage.

7.      Violation of Fourteenth Amendment Rights: Loss of liberty, chronic anxiety, emotional distress, and a diminished quality of life due to systematic harassment and unequal treatment.

8.      Invasion of Privacy via Remote Neural Monitoring: Damage to emotional well-being and psychological security, leading to feelings of violation and vulnerability.

9.      Data Breach and Unauthorized Access to Electronic Devices: Financial loss from identity theft, emotional distress from privacy invasion, and disruption to daily life and finances.

10.      Severe Invasion of Privacy and Emotional Distress: Ongoing emotional trauma from relentless monitoring in personal spaces, leading to heightened anxiety and constant fear.

11.      Hostile Work Environment: Decreased job performance, emotional distress, and professional harm, resulting in financial loss and career disruption.

12.      Misappropriation of Trade Secrets: Financial harm due to lost income and opportunities, emotional distress, and damage to professional reputation.

13.      Coercion into Criminal Activity: Psychological trauma, increased fear, emotional distress, and damage to personal integrity.

14.      Physical Harm via Remote Neural Monitoring: Chronic pain, physical deformities, and health issues, including emotional and psychological suffering from forced physiological changes.

15.      Manipulated Sexual Attraction and Identity: Emotional distress, confusion about personal identity, and harm to intimate relationships.

16.      Non-Consensual Sexual Manipulation: Severe emotional and psychological damage, leading to trust issues, trauma, and harm to personal relationships.

17.      Publication of Pornographic Videos: Emotional trauma and psychological harm due to exposure to non-consensual pornography, causing feelings of violation and degradation.

18.      Creation and Publication of Manipulative Pornographic Material: Damage to emotional well-being and trust, leading to long-term psychological trauma.

19.      Collaboration with Musicians to Promote Abuse: Emotional trauma from exposure to media content reinforcing abuse, leading to psychological harm and distress.

20.      Coercion and Manipulation by Government Entities: Emotional distress and fear, causing chronic anxiety and a diminished sense of safety and autonomy.

21.      Forced Learning and Manipulation: Emotional trauma from conditioning related to personal identity markers, leading to anxiety and confusion.

22.      Invasive Surveillance Since Prenatal Development: Lifelong emotional harm, anxiety, and a chronic sense of insecurity due to invasive monitoring.

23.      Physical Ailments from Defective Equipment: Physical pain, chronic health issues, and emotional distress from long-term radiation burns and related injuries.

24.    False Imprisonment: Emotional harm and trauma from restricted freedom, leading to psychological distress and feelings of powerlessness.

25.    Organized Stalking and RNM: Severe emotional distress, anxiety, paranoia, and emotional trauma from relentless harassment and monitoring.

26.    Misappropriation of Intellectual Property: Financial losses, professional harm, emotional distress, and damage to career opportunities and reputation.

27.    Harassment via Telephone: Emotional distress, chronic anxiety, and disruption to daily life from constant harassment and threats.

28.    Denial of Asylum and Continued Harassment: Emotional trauma, fear for personal safety, and chronic distress due to continued targeting and abuse.

29.    Surveillance During Travel: Emotional harm, anxiety, and a reduced sense of safety and privacy while traveling, impacting the plaintiff's freedom of movement.

30.    Physical Assault in Frankfurt: Physical injuries and emotional trauma from being assaulted, leading to long-term psychological and physical damage.

31.    Unlawful Tracking & Mind Reading: Invasion of mental privacy, emotional harm, anxiety, and feelings of violation from continuous tracking.

32.    Technological Harassment: Emotional distress, anxiety, and disruption to the plaintiff's life due to manipulation by advanced technology.

33.    Voice Morphing/Cloning: Emotional harm and damage to reputation, self-esteem, and relationships caused by manipulation of the plaintiff's voice.

34.    Hearing Capability: Emotional trauma, anxiety, and confusion caused by eavesdropping and auditory manipulation.

35.    Directed Energy Assaults: Physical injuries, chronic pain, and emotional distress from assaults using directed energy weapons.

36.    Control of Sleep Patterns: Chronic fatigue, emotional distress, and psychological harm from interference with sleep cycles.

37.    Computer-to-Brain Interface: Emotional trauma, confusion, and anxiety from manipulation of thoughts, memories, and actions.

38.    Organized Stalking & Thought Monitoring: Severe emotional trauma, paranoia, and psychological harm from systematic stalking and thought monitoring.

39.    Electronic Disturbances: Disruption to daily life and emotional harm caused by continuous interference and monitoring.

40.    Microwave Hearing/Synthetic Telepathy: Emotional distress, confusion, and psychological trauma caused by forced auditory cues and manipulation.

41.    Visual and Auditory Hallucinations: Emotional harm, fear, and psychological trauma from induced hallucinations.

42.    Remote Physical Manipulation: Emotional distress and confusion caused by manipulation of physical sensations, leading to feelings of helplessness.

43.    Thought Parroting & Directed Conversations: Emotional harm, anxiety, and paranoia caused by manipulation and mirroring of thoughts in conversations.

44.      Remote Behavioral Control: Emotional distress, anxiety, and feelings of loss of autonomy due to manipulation of actions and behavior.

45.      Long-Term Health Risks: Chronic anxiety, emotional distress, and fear of future health complications from prolonged exposure to harmful RNM technologies.

46.      Psychological Warfare: Severe emotional trauma, anxiety, and psychological damage from the systematic campaign of psychological manipulation.

47.      Corruption and Racketeering: Emotional distress, fear, and loss of trust in institutions due to involvement in organized crime and corruption.

48.      Fraudulent Health Claims: Emotional harm, anxiety, and confusion caused by manipulation of health claims, leading to distrust in medical treatment.

## V. Injury or Damages

1.      Birth Under Extreme Circumstances Due to Remote Neural Monitoring (RNM): But for the traumatic conditions influenced by RNM, the plaintiff would not have been born with compromised physiological and psychological well-being from the outset.

2.      Violation of First Amendment Rights: But for the suppression of Mr. Buchanan's freedom of speech and expression by remote neural monitoring and electronic harassment, he would have engaged fully in creative and expressive activities since childhood, without limitation.

3.      Violation of Fourth Amendment Rights: But for the defendants' illegal surveillance through remote neural monitoring and GPS tracking, the plaintiff would not have had his reasonable expectation of privacy infringed, an ongoing violation since childhood and intensifying since 2016.

4.      Violation of Fifth Amendment Rights: But for the psychological manipulation and coercion via remote neural monitoring, Mr. Buchanan would not have been deprived of due process and self-defense, significantly impacting him since 2017.

5.      Violation of Sixth Amendment Rights: But for the defendants' obstruction of Mr. Buchanan's right to a fair trial through compromised legal communications and resources via blackmail and coercion, he would have had a fair trial, particularly from 2022 to the present.

6.      Violation of Eighth Amendment Rights: But for the physical and psychological abuse enabled by RNM, the plaintiff would not have suffered cruel and unusual punishment, which has escalated from childhood through 2022 and beyond.

7.      Violation of Fourteenth Amendment Rights: But for the systematic surveillance and harassment by the defendants, Mr. Buchanan would have enjoyed equal protection under the law, occurring across the U.S. and during international travel from early childhood to the present.

8.      Invasion of Privacy via Remote Neural Monitoring: But for the unauthorized access to Mr. Buchanan's private medical and financial information through RNM, he would not have experienced significant emotional distress, particularly from 2016 onward.

9.      Data Breach and Unauthorized Access to Electronic Devices: But for the defendants accessing Mr. Buchanan's electronic devices and social media accounts without

permission since about 2012, he would not have faced identity theft and personal information loss.

10.   Severe Invasion of Privacy and Emotional Distress: But for the monitoring in private and public bathrooms, the plaintiff would not have experienced severe emotional distress leading to feelings of vulnerability and anxiety.

11.   Hostile Work Environment: But for the remote neural monitoring at the plaintiff's workplace, he would not have faced a hostile environment that hindered his job performance from 2018 to the present.

12.   Misappropriation of Trade Secrets: But for the defendants using RNM to steal the plaintiff's proprietary ideas and trade secrets in technology and fashion, he would not have suffered financial and reputational damage since 2012.

13.   Coercion into Criminal Activity: But for the defendants allegedly coercing the plaintiff into criminal activities through RNM and organized stalking, he would not have faced legal consequences and media portrayals since 2018.

14.   Physical Harm via Remote Neural Monitoring: But for the use of RNM, the plaintiff would not have developed various physical ailments, including deformities and health disorders, from childhood to the present.

15.   Manipulated Sexual Attraction and Identity: But for the manipulation of his attraction to both genders due to RNM, the plaintiff would not have faced confusion regarding his sexual identity and autonomy.

16.   Non-Consensual Sexual Manipulation: But for the defendants reportedly using RNM and pornography to coerce the plaintiff into sexual acts against his will, he would have maintained autonomy over his sexual choices.

17.   Publication of Pornographic Videos: But for the defendants creating and disseminating pornographic videos intended for the plaintiff's viewing, he would not have been subjected to brainwashing and mind control techniques.

18.   Creation and Publication of Manipulative Pornographic Material: But for the creation of pornographic videos aimed at manipulating the plaintiff's psychological state, his privacy and dignity would not have been violated.

19.   Collaboration with Musicians to Promote Abuse: But for the alleged collaboration of the defendants with musicians to produce content reinforcing the sexual abuse experienced by the plaintiff, he would not have faced additional psychological coercion.

20.   Coercion and Manipulation by Government Entities: But for the DEA and other government entities transmitting covert messages to manipulate the plaintiff into engaging in drug-related criminal activities, he would not have suffered violations of his rights or abuses of governmental power.

21.   Forced Learning and Manipulation: But for the conditioning to associate personal identifiers with control and vulnerability through RNM techniques, the plaintiff would not have experienced ongoing psychological distress.

22.     Invasive Surveillance Since Prenatal Development: But for the continuous surveillance from prenatal development to the present, the plaintiff would not have suffered emotional distress and physical harm affecting his quality of life.

23.     Physical Ailments from Defective Equipment: But for the defective surveillance equipment emitting harmful radiation, the plaintiff would not have suffered physical harm and radiation burns from mid-2022 onward.

24.     False Imprisonment: But for the defendants restricting the plaintiff's freedom of movement through RNM and psychological manipulation, he would not have been subjected to unlawful confinement since 2023.

25.     Organized Stalking and RNM: But for the coordinated effort to provoke fear and self-incrimination through organized stalking and GPS tracking of the plaintiff, he would not have experienced ongoing psychological distress from 2017 to the present.

26.     Misappropriation of Intellectual Property: But for the illegal surveillance allowing the defendants to benefit from the plaintiff's intellectual property, he would not have experienced financial losses since 2012.

27.     Harassment via Telephone: But for the continuous unwanted phone calls, the plaintiff would not have suffered distress since 2022.

28.     Denial of Asylum and Continued Harassment: But for the ongoing torture and harassment following the plaintiff's application for asylum in Canada, he would not have faced undue psychological trauma without knowledge of RNM technology.

29.     Surveillance During Travel: But for the constant surveillance during international travel since April 2023, the plaintiff would not have experienced emotional distress.

30.     Physical Assault in Frankfurt: But for the assault by individuals acting on behalf of the defendants in March 2024 in Frankfurt, the plaintiff would not have faced physical harm.

31.     Unlawful Tracking & Mind Reading: But for the continuous tracking and thought monitoring through RNM technology since childhood, the plaintiff would not have experienced psychological harm.

32.     Technological Harassment: But for the advanced technology used to harass the plaintiff since 2014, he would not have faced significant psychological and emotional damage.

33.     Voice Morphing/Cloning: But for the defendants manipulating the plaintiff's voice, he would not have suffered harm to his self-esteem since 2021.

34.     Hearing Capability: But for the eavesdropping and forced auditory manipulation, the plaintiff would not have experienced psychological distress since 2010.

35.     Directed Energy Assaults: But for the physical assaults via directed energy weapons since 2022, the plaintiff would not have suffered ongoing physical harm.

36.     Control of Sleep Patterns: But for the interference with sleep patterns by RNM technology since 2022, the plaintiff would not have faced long-term health consequences.

37.     Computer-to-Brain Interface: But for the manipulation of thoughts and memories through RNM technology since 2012, the plaintiff would not have experienced cognitive distress.

38.    Organized Stalking & Thought Monitoring: But for the systematic organized stalking and thought control since 2001, the plaintiff would not have faced ongoing psychological harm.

39.    Electronic Disturbances: But for the disruptions in the plaintiff's daily life caused by RNM technology since 2004, he would not have suffered emotional distress.

40.    Microwave Hearing/Synthetic Telepathy: But for the forced auditory cues and ringing in ears experienced since 2004, the plaintiff would not have endured ongoing psychological trauma.

41.    Visual and Auditory Hallucinations: But for the induced hallucinations through RNM technology since 2020, the plaintiff would not have suffered significant psychological distress.

42.    Remote Physical Manipulation: But for the alleged remote control of physical sensations since 2017, the plaintiff would not have faced ongoing physical discomfort.

43.    Thought Parroting & Directed Conversations: But for the defendants mimicking the plaintiff's thoughts in public media since 2018, he would not have suffered humiliation and psychological harm.

44.    Remote Behavioral Control: But for the manipulation of the plaintiff's actions and emotions through RNM since 2020, he would not have faced significant personal challenges.

45.    Long-Term Health Risks: But for the ongoing use of RNM technology since 2022, the plaintiff would not have faced serious long-term health risks.

46.    Psychological Warfare: But for the psychological campaign aimed at destabilizing the plaintiff's mental health since 2012, he would not have endured ongoing psychological harm.

47.    Corruption and Racketeering: But for the involvement of government officials in organized crime facilitated through RNM, the plaintiff would not have faced unjust persecution.

48.    Fraudulent Health Claims: But for the misdiagnosis of health conditions intended to conceal RNM usage since 2007, the plaintiff would not have suffered emotional and financial damages.

## VI. Causation

1.    Birth Under Extreme Circumstances Due to Remote Neural Monitoring (RNM): But for the traumatic conditions influenced by RNM, the plaintiff would not have been born on June 4, 1998, compromising their physiological and psychological well-being from the outset.

2.    Violation of First Amendment Rights: But for remote neural monitoring and electronic harassment, Mr. Buchanan's freedom of speech and expression would not have been suppressed, allowing for greater engagement in creative and expressive activities since childhood, particularly escalating from 2022.

3.    Violation of Fourth Amendment Rights: But for the defendants conducting illegal surveillance through remote neural monitoring and GPS tracking, the plaintiff's reasonable expectation of privacy would not have been infringed, a violation ongoing since childhood and intensifying since 2016.

4.     Violation of Fifth Amendment Rights: But for psychological manipulation and coercion via remote neural monitoring, Mr. Buchanan would not have been deprived of due process and self-defense, impacting him significantly since 2017.

5.     Violation of Sixth Amendment Rights: But for the defendants obstructing Mr. Buchanan's right to a fair trial by compromising his legal communications and resources through blackmail and coercion, primarily from 2022 to the present, he would have had a fairer legal process.

6.     Violation of Eighth Amendment Rights: But for the physical and psychological abuse enabled by RNM, the plaintiff would not have suffered cruel and unusual punishment, escalating from childhood through 2022 and beyond.

7.     Violation of Fourteenth Amendment Rights: But for systematic surveillance and harassment by the defendants, Mr. Buchanan would not have been denied equal protection under the law, which has occurred across the U.S. and during international travel from early childhood to the present.

8.     Invasion of Privacy via Remote Neural Monitoring: But for the unauthorized access to Mr. Buchanan's private medical and financial information through RNM, he would not have experienced significant emotional distress, particularly from 2016 onward.

9.     Data Breach and Unauthorized Access to Electronic Devices: But for the defendants accessing Mr. Buchanan's electronic devices and social media accounts without permission since about 2012, he would not have suffered identity theft and personal information loss.

10.     Severe Invasion of Privacy and Emotional Distress: But for being monitored in private and public bathrooms, the plaintiff would not have experienced severe emotional distress, leading to feelings of vulnerability and anxiety.

11.     Hostile Work Environment: But for the remote neural monitoring at the plaintiff's workplace, he would not have faced a hostile environment that hindered his job performance from 2018 to the present.

12.     Misappropriation of Trade Secrets: But for the defendants using RNM to steal the plaintiff's proprietary ideas and trade secrets in technology and fashion from 2012 onward, the plaintiff would have maintained control over his intellectual property.

13.     Coercion into Criminal Activity: But for the defendants allegedly coercing the plaintiff into criminal activities through RNM and organized stalking, supported by media portrayals since 2018, he would not have faced these criminal implications.

14.     Physical Harm via Remote Neural Monitoring: But for the use of RNM, the plaintiff would not have experienced various physical ailments, including deformities and health disorders, from childhood to the present.

15.     Manipulated Sexual Attraction and Identity: But for the manipulation into attraction to both genders due to RNM, the plaintiff would not have faced confusion regarding his sexual identity and autonomy.

16. Non-Consensual Sexual Manipulation: But for the defendants reportedly using RNM and pornography to coerce the plaintiff into sexual acts against his will, he would not have suffered from forced sensations and manipulation.

17. Publication of Pornographic Videos: But for the defendants creating and disseminating pornographic videos intended for the plaintiff's viewing, he would not have been subjected to brainwashing and mind control techniques.

18. Creation and Publication of Manipulative Pornographic Material: But for the creation of pornographic videos aimed at manipulating the plaintiff's psychological state, his privacy and dignity would not have been violated.

19. Collaboration with Musicians to Promote Abuse: But for the defendants allegedly collaborating with musicians to produce content that reinforces the sexual abuse experienced by the plaintiff, he would not have been subjected to psychological coercion through media.

20. Coercion and Manipulation by Government Entities: But for the DEA and other government entities transmitting covert messages to manipulate the plaintiff into engaging in drug-related criminal activities, he would not have faced such violations of his rights and governmental abuse.

21. Forced Learning and Manipulation: But for the conditioning to associate personal identifiers (like Social Security and bank account numbers) with control and vulnerability through RNM techniques, the plaintiff would not have suffered from this psychological manipulation.

22. Invasive Surveillance Since Prenatal Development: But for the continuous surveillance from prenatal development to the present, the plaintiff would not have experienced emotional distress and physical harm affecting his quality of life.

23. Physical Ailments from Defective Equipment: But for the defective surveillance equipment emitting harmful radiation, the plaintiff would not have suffered physical harm and radiation burns from mid-2022 onward.

24. False Imprisonment: But for the defendants restricting the plaintiff's freedom of movement through RNM and psychological manipulation, he would not have faced the effects of false imprisonment since 2023.

25. Organized Stalking and RNM: But for the coordinated effort to provoke fear and self-incrimination through organized stalking and GPS tracking of the plaintiff from 2017 to the present, he would not have endured such distress.

26. Misappropriation of Intellectual Property: But for illegal surveillance allowing the defendants to benefit from the plaintiff's intellectual property since 2012, he would have retained control over his ideas and innovations.

27. Harassment via Telephone: But for the continuous unwanted phone calls since 2022, the plaintiff would not have experienced the distress resulting from this harassment.

28. Denial of Asylum and Continued Harassment: But for the ongoing torture and harassment faced after applying for asylum in Canada without knowledge of RNM technology, the plaintiff would have had a different experience in seeking refuge.

29.    Surveillance During Travel: But for the constant surveillance during international travel since April 2023, the plaintiff would not have suffered emotional distress related to his movements.

30.    Physical Assault in Frankfurt: But for the assault by individuals acting on behalf of the defendants in March 2024 in Frankfurt, Germany, the plaintiff would not have experienced this violation of his safety.

31.    Unlawful Tracking & Mind Reading: But for the continuous tracking and thought monitoring through RNM technology since childhood, the plaintiff would not have faced the psychological impacts of these invasions.

32.    Technological Harassment: But for the advanced technology (including DEWs and audio/video surveillance) used to harass the plaintiff since 2014, he would not have experienced the associated psychological distress.

33.    Voice Morphing/Cloning: But for the defendants allegedly manipulating the plaintiff's voice to harm his self-esteem since 2021, he would not have faced this assault on his identity.

34.    Hearing Capability: But for the eavesdropping and forced auditory manipulation, the plaintiff would not have suffered psychological distress since 2010.

35.    Directed Energy Assaults: But for the physical assaults via directed energy weapons (DEWs) since 2022, the plaintiff would not have endured these harmful experiences.

36.    Control of Sleep Patterns: But for the interference with sleep patterns caused by RNM technology since 2022, the plaintiff would have experienced better rest and overall well-being.

37.    Computer-to-Brain Interface: But for the manipulation of thoughts and memories through RNM technology since 2012, the plaintiff would have retained his cognitive autonomy.

38.    Organized Stalking & Thought Monitoring: But for the systematic organized stalking and thought control since 2001, the plaintiff would not have faced the resulting emotional and psychological distress.

39.    Electronic Disturbances: But for the disruptions in the plaintiff's daily life caused by RNM technology since 2004, he would not have experienced these significant interruptions.

40.    Microwave Hearing/Synthetic Telepathy: But for the forced auditory cues and ringing in the ears experienced since 2004, the plaintiff would not have faced these distressing sensations.

41.    Visual and Auditory Hallucinations: But for the induced hallucinations through RNM technology since 2020, the plaintiff would have maintained a clearer perception of reality.

42.    Remote Physical Manipulation: But for the alleged remote control of physical sensations since 2017, the plaintiff would not have endured this invasive interference.

43.    Thought Parroting & Directed Conversations: But for the defendants mimicking the plaintiff's thoughts in public media since 2018, he would not have suffered from this violation of his mental privacy.

44.     Remote Behavioral Control: But for the manipulation of the plaintiff's actions and emotions through RNM since 2020, he would have acted with greater autonomy and self-determination.

45.     Long-Term Health Risks: But for the ongoing use of RNM technology since 2022, the plaintiff would not have been exposed to serious health risks affecting his quality of life.

46.     Psychological Warfare: But for the psychological campaign aimed at destabilizing the plaintiff's mental health since 2012, he would not have experienced the associated trauma.

47.     Corruption and Racketeering: But for the involvement of government officials in organized crime facilitated through RNM, the plaintiff would not have faced these violations of his rights.

48.     Fraudulent Health Claims: But for the misdiagnosis of health conditions intended to conceal RNM usage since 2007, the plaintiff would not have endured the consequences of these deceptive practices.

## VII. Compliance with Regulations

1.     Birth Under Extreme Circumstances Due to Remote Neural Monitoring (RNM): Non-compliance with healthcare regulations regarding prenatal care and the ethical treatment of expectant mothers.

2.     Violation of First Amendment Rights: Breach of constitutional rights as outlined in the First Amendment, including laws protecting free speech and expression.

3.     Violation of Fourth Amendment Rights: Violation of Fourth Amendment protections against unreasonable searches and seizures, as enforced by both federal and state laws.

4.     Violation of Fifth Amendment Rights: Non-compliance with due process requirements established by the Fifth Amendment and related federal and state laws.

5.     Violation of Sixth Amendment Rights: Failure to uphold the rights to a fair trial and adequate defense under the Sixth Amendment, violating procedural due process.

6.     Violation of Eighth Amendment Rights: Breach of Eighth Amendment protections against cruel and unusual punishment as mandated by constitutional law.

7.     Violation of Fourteenth Amendment Rights: Non-compliance with equal protection under the law as required by the Fourteenth Amendment, which should govern treatment by government entities.

8.     Invasion of Privacy via Remote Neural Monitoring: Violations of privacy laws, including the Electronic Communications Privacy Act (ECPA) and state privacy regulations.

9.     Data Breach and Unauthorized Access to Electronic Devices: Non-compliance with data protection laws such as the General Data Protection Regulation (GDPR) or the California Consumer Privacy Act (CCPA).

10.     Severe Invasion of Privacy and Emotional Distress: Breach of state tort laws regarding privacy and infliction of emotional distress.

11.     Hostile Work Environment: Non-compliance with workplace harassment regulations under Title VII of the Civil Rights Act and related employment laws.

12.     Misappropriation of Trade Secrets: Violation of the Defend Trade Secrets Act (DTSA) and related state laws regarding the protection of intellectual property.

13.     Coercion into Criminal Activity: Breach of laws against coercion and conspiracy, violating state criminal statutes.

14.     Physical Harm via Remote Neural Monitoring: Violations of state health and safety regulations, particularly regarding the use of harmful technology.

15.     Manipulated Sexual Attraction and Identity: Breach of laws protecting personal identity and autonomy, including laws against psychological manipulation.

16.     Non-Consensual Sexual Manipulation: Violations of sexual assault laws and regulations surrounding consent and personal autonomy.

17.     Publication of Pornographic Videos: Non-compliance with laws governing consent and distribution of adult content, including federal and state obscenity laws.

18.     Creation and Publication of Manipulative Pornographic Material: Breach of laws regarding copyright, consent, and the right to privacy.

19.     Collaboration with Musicians to Promote Abuse: Violations of intellectual property laws and regulations related to ethical artistic collaboration.

20.     Coercion and Manipulation by Government Entities: Non-compliance with laws prohibiting coercive practices by government entities and abuse of power.

21.     Forced Learning and Manipulation: Breach of educational regulations that protect individuals from coercive or manipulative practices.

22.     Invasive Surveillance Since Prenatal Development: Violations of laws governing parental rights and child protection, as well as privacy regulations.

23.     Physical Ailments from Defective Equipment: Non-compliance with consumer safety regulations and product liability laws regarding defective technology.

24.     False Imprisonment: Violations of laws against unlawful confinement and detention, breaching personal liberty protections.

25.     Organized Stalking and RNM: Non-compliance with anti-stalking laws and regulations aimed at protecting individuals from harassment.

26.     Misappropriation of Intellectual Property: Breach of intellectual property laws, including copyright, trademark, and trade secret protections.

27.     Harassment via Telephone: Violations of the Telephone Consumer Protection Act (TCPA) and related laws regarding unsolicited communications.

28.     Denial of Asylum and Continued Harassment: Breach of immigration laws and regulations protecting asylum seekers from persecution.

29.     Surveillance During Travel: Violations of international privacy laws and regulations regarding surveillance of individuals during travel.

30.     Physical Assault in Frankfurt: Breach of local and international laws regarding personal safety and the right to security.

31.    Unlawful Tracking & Mind Reading: Violations of privacy laws prohibiting unauthorized surveillance and invasion of mental privacy.

32.    Technological Harassment: Non-compliance with laws addressing harassment and the use of technology to inflict emotional harm.

33.    Voice Morphing/Cloning: Violations of intellectual property and privacy rights laws concerning the unauthorized use of personal identity.

34.    Hearing Capability: Breach of health regulations protecting individuals from auditory manipulation and its psychological effects.

35.    Directed Energy Assaults: Non-compliance with health and safety regulations governing the use of energy weapons and their effects on individuals.

36.    Control of Sleep Patterns: Violations of health regulations concerning sleep disorders and psychological well-being.

37.    Computer-to-Brain Interface: Breach of laws regulating medical and technological interventions in personal autonomy and mental health.

38.    Organized Stalking & Thought Monitoring: Non-compliance with anti-stalking laws and regulations protecting personal autonomy and privacy.

39.    Electronic Disturbances: Violations of consumer protection laws regarding the unauthorized use of technology causing distress.

40.    Microwave Hearing/Synthetic Telepathy: Non-compliance with regulations governing the use of electromagnetic frequencies and their impact on human health.

41.    Visual and Auditory Hallucinations: Violations of mental health regulations concerning ethical treatment and intervention practices.

42.    Remote Physical Manipulation: Breach of laws protecting personal autonomy and the use of technology for physical control.

43.    Thought Parroting & Directed Conversations: Non-compliance with privacy laws regulating the unauthorized use of personal thoughts and conversations.

44.    Remote Behavioral Control: Violations of psychological treatment regulations concerning manipulation and control of individual behavior.

45.    Long-Term Health Risks: Non-compliance with public health regulations regarding the long-term effects of technological exposure.

46.    Psychological Warfare: Violations of laws prohibiting psychological manipulation and warfare tactics against individuals.

47.    Corruption and Racketeering: Breach of laws governing corruption, organized crime, and racketeering practices, violating federal and state regulations.

48.    Fraudulent Health Claims: Non-compliance with healthcare regulations that require truthful representations and protect patients from deceptive practices.

VIII. Legal Authority

1.      Birth Under Extreme Circumstances Due to Remote Neural Monitoring (RNM): Federal and state health regulations, including the Affordable Care Act and state maternal health laws.

2.      Violation of First Amendment Rights: U.S. Constitution, Amendment I; legal precedents regarding freedom of speech and expression.

3.      Violation of Fourth Amendment Rights: U.S. Constitution, Amendment IV; case law on unreasonable searches and seizures.

4.      Violation of Fifth Amendment Rights: U.S. Constitution, Amendment V; legal standards for due process.

5.      Violation of Sixth Amendment Rights: U.S. Constitution, Amendment VI; legal authority on the right to a fair trial and counsel.

6.      Violation of Eighth Amendment Rights: U.S. Constitution, Amendment VIII; precedents regarding cruel and unusual punishment.

7.      Violation of Fourteenth Amendment Rights: U.S. Constitution, Amendment XIV; legal principles on equal protection and due process.

8.      Invasion of Privacy via Remote Neural Monitoring: Electronic Communications Privacy Act (ECPA), state privacy laws, and tort law on invasion of privacy.

9.      Data Breach and Unauthorized Access to Electronic Devices: Computer Fraud and Abuse Act (CFAA), General Data Protection Regulation (GDPR), and California Consumer Privacy Act (CCPA).

10.      Severe Invasion of Privacy and Emotional Distress: State tort laws regarding privacy and infliction of emotional distress.

11.      Hostile Work Environment: Title VII of the Civil Rights Act of 1964; federal and state employment discrimination laws.

12.      Misappropriation of Trade Secrets: Defend Trade Secrets Act (DTSA); Uniform Trade Secrets Act (UTSA) in various states.

13.      Coercion into Criminal Activity: State criminal laws on coercion, conspiracy, and solicitation.

14.      Physical Harm via Remote Neural Monitoring: State health and safety regulations, including those governing the use of harmful technologies.

15.      Manipulated Sexual Attraction and Identity: Laws protecting personal identity and autonomy, including state and federal anti-discrimination laws.

16.      Non-Consensual Sexual Manipulation: State sexual assault laws and regulations regarding consent.

17.      Publication of Pornographic Videos: Federal and state obscenity laws, including the Miller test for defining obscene material.

18.      Creation and Publication of Manipulative Pornographic Material: Copyright law, state privacy laws, and regulations regarding consent.

19.      Collaboration with Musicians to Promote Abuse: Intellectual property laws and ethical guidelines governing artistic collaboration.

20.     Coercion and Manipulation by Government Entities: Constitutional law regarding abuse of power and coercive practices by government entities.

21.     Forced Learning and Manipulation: Federal and state laws governing educational practices and student rights.

22.     Invasive Surveillance Since Prenatal Development: Child protection laws and parental rights statutes.

23.     Physical Ailments from Defective Equipment: Consumer safety regulations, including the Consumer Product Safety Act and state product liability laws.

24.     False Imprisonment: State laws against false imprisonment and wrongful detention.

25.     Organized Stalking and RNM: State anti-stalking laws and harassment statutes.

26.     Misappropriation of Intellectual Property: Copyright law, trademark law, and trade secret protection laws.

27.     Harassment via Telephone: Telephone Consumer Protection Act (TCPA) and state harassment laws.

28.     Denial of Asylum and Continued Harassment: Immigration and Nationality Act (INA) and international human rights treaties.

29.     Surveillance During Travel: International privacy laws and treaties governing the protection of individuals while traveling.

30.     Physical Assault in Frankfurt: Local laws regarding personal safety and international human rights standards.

31.     Unlawful Tracking & Mind Reading: Privacy laws prohibiting unauthorized surveillance and mental intrusion.

32.     Technological Harassment: State laws addressing harassment and emotional distress caused by technology.

33.     Voice Morphing/Cloning: Intellectual property laws, privacy laws, and identity theft statutes.

34.     Hearing Capability: Health regulations regarding auditory manipulation and the right to medical treatment.

35.     Directed Energy Assaults: Federal and state laws regulating the use of directed energy weapons and their safety.

36.     Control of Sleep Patterns: Health regulations regarding psychological treatment and ethical standards in medicine.

37.     Computer-to-Brain Interface: Medical ethics laws, FDA regulations, and laws governing technological interventions.

38.     Organized Stalking & Thought Monitoring: State anti-stalking laws and constitutional protections against harassment.

39.     Electronic Disturbances: Consumer protection laws against unauthorized use of technology causing distress.

40.  Microwave Hearing/Synthetic Telepathy: Regulations governing the use of electromagnetic frequencies and health safety standards.

41.  Visual and Auditory Hallucinations: Mental health regulations concerning ethical treatment and patient rights.

42.  Remote Physical Manipulation: Laws protecting personal autonomy and prohibiting non-consensual physical control.

43.  Thought Parroting & Directed Conversations: Privacy laws regulating the unauthorized use of personal thoughts and conversations.

44.  Remote Behavioral Control: Laws governing psychological treatment and patient consent.

45.  Long-Term Health Risks: Public health regulations governing the use of technology and its impact on health.

46.  Psychological Warfare: Laws prohibiting psychological manipulation, including civil rights statutes and international human rights standards.

47.  Corruption and Racketeering: Racketeer Influenced and Corrupt Organizations Act (RICO) and state laws on organized crime.

48.  Fraudulent Health Claims: Federal Trade Commission (FTC) regulations against deceptive health claims and practices.

## IX. Resulting Harm

1. Physical Harm:

Microwave Radiation Exposure: The Plaintiff, Mr. Buchanan, suffered severe physical ailments due to The Defendants' overuse of remote neural monitoring technology, including:

Radiation burns from defective surveillance equipment.

Chronic pain in the testicles and penis, resulting in Peyronie's disease.

Vision impairments, including blurry and double vision, astigmatism, and eye deformities from prolonged exposure to RNM radiation.

Toothaches leading to cavities, malocclusion, and jaw misalignment, causing discomfort.

Hair loss and scalp stress due to prolonged surveillance.

Persistent muscle spasms and twitches.

Sexual dysfunction and abuse from remote manipulation of Mr. Buchanan's body, causing physical and emotional distress.

2. Psychological Harm:

Emotional Distress and Psychological Torture: The Plaintiff has been subjected to:

Microwave hearing and auditory disturbances from continuous RNM.

Forced intrusive thoughts and manipulation of mental state, leading to severe anxiety, depression, and emotional trauma.

Invasion of privacy resulting in constant fear, paranoia, and self-incrimination through mind-reading and blackmail.

Mental torment from gangstalking, constant surveillance, and emotional manipulation designed to embarrass and humiliate.

Forced memory blanking causing lapses in memory and increased confusion.

3. Financial Harm:

Loss of Employment and Income:

The Plaintiff experienced harassment at work, leading to job loss and financial instability.

Harassment by peers and supervisors influenced by gangstalking and illegal surveillance.

Inability to perform job duties due to mental and physical distractions.

Job loss from coerced self-incrimination and manipulation.

Misappropriation of Trade Secrets and Intellectual Property:

Theft of ideas and trade secrets leading to financial loss.

Unauthorized use of intellectual property by various corporations.

Lost business opportunities due to public dissemination and misuse of confidential information.

4. Invasion of Privacy and Constitutional Violations:

Illegal Surveillance and Data Breach:

Violation of privacy through continuous RNM surveillance of personal activities and sensitive information.

Hacking of personal devices and exposure of sensitive information.

Monitoring of what the Plaintiff sees using eye control technology.

Gangstalking and Harassment by Civilians and Law Enforcement:

Harassment and intimidation by civilians and law enforcement, including forced altercations with strangers.

5. Sexual Harassment and Exploitation:

Broadcast of pornographic material and forced sexual stimulation, violating personal autonomy.

Brainwashing and coercion into sexual activity against the Plaintiff's will.

6. Forced Interaction with Criminal Syndicates:

Coercion into Illegal Activities:

Indirect facilitation of interactions with criminal syndicates, including drug gangs, through manipulation and blackmail.

7. Long-Term Health Consequences:

Permanent Physical Damage:

Peyronie's disease, vision deformities, and chronic pain due to sustained harassment and manipulation.

Clammy and double skin.

8. Psychological Disorders:
Long-term psychological conditions such as severe anxiety, PTSD, and depression from ongoing trauma and manipulation.

9. Constitutional Violations:
Violation of the Plaintiff's Constitutional Rights:
First Amendment Rights: Infringement on free speech, expression, and creativity.
Fourth Amendment Rights: Severe violation of privacy through illegal surveillance.
Fifth Amendment Rights: Coerced self-incrimination and deprivation of due process.
Sixth Amendment Rights: Denial of a fair trial and legal representation due to compromised attorney-client privilege.
Eighth Amendment Rights: Subjected to cruel and unusual punishment through physical and psychological abuse.
Fourteenth Amendment Rights: Denial of equal protection and due process under the law due to systemic manipulation and discrimination.

## X. Summary of Resulting Harm

The harm resulting from The Defendants' actions has severely affected Mr. Buchanan's physical health, psychological well-being, financial stability, privacy, and constitutional rights, leading to profound and lasting consequences across multiple aspects of his life. The Plaintiff, Diamond Buchanan, suffered significant harm due to The Defendants unlawful use of remote neural monitoring, electronic harassment, and illegal surveillance. These actions caused permanent physical damage, emotional and mental health issues, loss of employment, and a significant invasion of privacy, resulting in lifelong repercussions for Mr. Buchanan.

## XI. Conclusion

The Plaintiff, Diamond Dajour Buchanan, has suffered extensive harm due to the actions of The Defendants, including violations of his constitutional rights, false imprisonment, and various forms of psychological and physical abuse. The Defendants' conduct has not only breached federal and state laws but also inflicted severe emotional, psychological, and physical damage on The Plaintiff. The continuous and invasive nature of these violations underscores the need for legal redress to address the extensive harm and restore The Plaintiff's rights and freedoms.

## XII. Prayer for Relief

WHEREFORE, Plaintiff Mr. Buchanan respectfully requests that this Court grant the following relief:

1. Joint and Several Liability for Compensatory Damages: That the Court find all Defendants jointly and severally liable for a total sum of $100,000,000,000 in compensatory damages for the Plaintiff's suffering as a result of their actions, including but not limited to:

| | |
|---|---|
| Microwave Hearing and Physical Harm | Illegal Monitoring and Coercion |
| Unlawful Interception of Communications | Physiological Torture and Manipulation |
| Infringement of Trade Secrets | Consistent Surveillance |
| Harassment and Cyberstalking | Harassment via Telephone |
| Indirect Stunts, Blackmail, and Coercion | Surveillance During Travel |
| Release of Private Information | Physical Assault |
| Forced Altercations and Incrimination | Misappropriation of Intellectual Property |
| Physical Harm and Beatings | False Imprisonment |
| Publication of Pornographic Videos | Violation of the Plaintiff's Civil Rights |
| Inducing Fear and Radiation Burns | Under the First, Fourth, Fifth, Sixth, Eighth, |
| Physical Deformities and Health Issues | and Fourteenth Amendment |

Monetary Damages: Award Plaintiff the total amount of $100,000,000,000 in compensatory damages, which encompasses damages for:

- Physical and Emotional Pain and Suffering
- Loss of Trade Secrets and Intellectual Property
- Loss of Income and Business Opportunities
- Medical Expenses for Physical and Mental Health Treatment
- Punitive Damages, as determined by the Court

### XIII. The Amount in Controversy

1. Compensatory Damages: The Plaintiff seeks compensatory damages for the extensive harm caused by The Defendants' actions, which include:

Medical Expenses: Costs for medical and psychological treatment related to physical injuries and emotional distress from The Defendants' invasive surveillance, electronic harassment, and physical assaults.

Lost Income and Reduced Earning Capacity: Compensation for lost wages and diminished earning capacity due to the impact of The Defendants actions on The Plaintiff's ability to work effectively.

Emotional Distress: Monetary damages for severe emotional and psychological suffering, including anxiety, depression, and mental anguish resulting from The Defendants' continuous harassment and surveillance.

Property Damage and Theft: Costs associated with damage to or theft of personal property, such as electronic devices and personal data, due to unauthorized access and surveillance by The Defendants.

Future Medical Costs: Projected future expenses for ongoing medical treatment and psychological therapy due to the long-term effects of The Defendants actions.

Loss of Quality of Life: Damages for the significant negative impact on The Plaintiff's overall quality of life due to the continuous harassment, surveillance, and physical harm inflicted by The Defendants.

2. Monetary Damages for Additional Claims: The Plaintiff seeks monetary damages related to the following specific claims:

Violation of Constitutional Rights: Compensation for the infringement of First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights, which has caused considerable emotional and psychological harm.

Invasion of Privacy and Data Breaches: Damages for unauthorized access to private data and electronic devices, including emotional and financial losses from these invasions.

Harassment and Psychological Manipulation: Compensation for damages resulting from ongoing harassment, psychological manipulation, and forced behavioral control, which have caused significant mental and emotional suffering.

Trade Secrets Misappropriation: Monetary damages for the theft and unauthorized use of proprietary ideas and intellectual property, resulting in financial losses and harm to The Plaintiff's business interests.

Unlawful Surveillance and Tracking: Claims for damages related to the use of unauthorized surveillance and real-time tracking technologies, including emotional distress and privacy violations.

Racketeering and Criminal Activities: Compensation for damages resulting from involvement in organized criminal activities and fraud orchestrated by The Defendants.

Physical Harm from Directed Energy Weapons: Damages for physical injuries and long-term health effects caused by assaults with Directed Energy Weapons (DEWs) and remote neural monitoring technologies.

Technological Harassment: Compensation for harassment through advanced technologies, including voice morphing, electronic disturbances, and induced hallucinations, which have disrupted The Plaintiff's daily life and well-being.

The total amount in controversy reflects the severe and extensive harm caused by The Defendants actions, justifying a claim that exceeds $75,000, exclusive of interest and court costs.

## 12. Misappropriation of Trade Secrets

The Defendants misappropriated Mr. Buchanan's proprietary trade secrets, including unique designs and manufacturing processes for vehicles, prosthetics, technology, high-end fashion garments and accessories, footwear, apparel, luxury leather goods, print designs, timepieces, firearms and accessories, gel blasters, knives, lasers, plots of television series and movies, video game and software development, including military watercraft.

The misappropriation was facilitated through remote neural monitoring and electronic harassment, causing significant harm to Mr. Buchanan. The trade secrets in question encompass a wide range of proprietary information, including but not limited to: See attached additional pages for the following claim:

### 1. Prof. Tamar Makin and Dani Clode

On or about May 2024, The Plaintiff discovered that The Defendants along with Prof. Tamar Makin and Dani Clode had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for a unique Prosthetic.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the prosthetics and orthotics industry.

### 2. Apple Inc.

On or about June 17, 2024, The Plaintiff discovered that The Defendants along with Apple Inc. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique technology and features.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the consumer electronics industry.

### 3. Samsung Electronics Co., Ltd.

On or about May 4, 2024, The Plaintiff discovered that The Defendants along with Samsung Electronics Co., Ltd. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique technology and features.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the consumer electronics industry.

### 4. Huawei Technologies Co., Ltd.

On or about May 4, 2024, The Plaintiff discovered that The Defendants along with Huawei Technologies Co., Ltd. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique technology and features.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the consumer electronics industry.

### 5. Mercedes-Benz USA

On or about July 12, 2024, The Plaintiff discovered that The Defendants along with Mercedes-Benz USA, including Maybach which is a sub-brand. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique vehicles.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the automotive industry.

### 6. Hyundai Motor Company

On or about January 9, 2024 The Plaintiff discovered that The Defendants along with Hyundai Motor Company had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique vehicles.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the automotive industry.

### 7. Volkswagen Group of America

On or about July 12, 2024, The Plaintiff discovered that The Defendants along with Audi, and Bugatti, which are major divisions of Volkswagen Group of America had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique vehicles.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the automotive industry.

### 8. General Motors Company

Between January 9, 2024 and May 16, 2024, The Plaintiff discovered that The Defendants along with Hummer, and Cadillac, which are major divisions of the General Motors Company. The Defendants had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique vehicles.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the automotive industry.

### 9. Stellantis N.V.

On or about approximately 2023 to the present day, The Plaintiff, discovered that The Defendants along with Dodge, and Jeep, which are major divisions of Stellantis N.V had accessed confidential files containing trade secrets without authorization. The Plaintiff was in Monroeville, PA at the time of the discovery.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique vehicles.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the automotive industry.

### 10. Renault USA, Inc.

On or about January 11, 2024, The Plaintiff discovered that The Defendants along with Renault USA, Inc. had accessed confidential files containing trade secrets without authorization. The Plaintiff was in Monroeville, PA at the time of the discovery.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique vehicles.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the automotive industry.

### 11. MG Motor.

On about or before July 12, 2024, The Plaintiff discovered that The Defendants along with MG Motor had accessed confidential files containing trade secrets without authorization. The Plaintiff was in Monroeville, PA at the time of the discovery.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique vehicles.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the automotive industry.

### 12. Verge Motorcycles OÜ

Between May and July, The Plaintiff discovered that The Defendants along with Verge Motorcycles OÜ had accessed confidential files containing trade secrets without authorization. The Plaintiff was in Monroeville, PA at the time of the discovery.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique vehicles.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the automotive industry.

### 13. Vetements Group AG

On about or before mid 2024, The Plaintiff discovered that The Defendants along with Vetements Group AG had accessed confidential files containing trade secrets without authorization. The Plaintiff was in Monroeville, PA at the time of the discovery.

The misappropriated trade secret involves proprietary designs and manufacturing processes for high-end fashion garments.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury fashion industry.

### 14. Chanel, Inc.

On about or before mid 2024, The Plaintiff, while at discovered that The Defendants along with Chanel, Inc. had accessed confidential files containing trade secrets without authorization. The Plaintiff was in Monroeville, PA at the time of the discovery.

The misappropriated trade secret involves proprietary designs and manufacturing processes for a high-end fashion accessories.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury fashion industry.

### 15. Balenciaga America, Inc.

On about or before Mid 2024, The Plaintiff discovered that The Defendants along with Balenciaga America, Inc. had accessed confidential files containing trade secrets without authorization. The Plaintiff was in Monroeville, PA at the time of the discovery.

The misappropriated trade secret involves proprietary designs and manufacturing processes for high-end fashion garments.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury fashion industry.

### 16. Louis Vuitton North America, Inc.

On about or before approximately 2024, The Plaintiff discovered that The Defendants along with Louis Vuitton North America, Inc. had accessed confidential files containing trade secrets without authorization. The Plaintiff was in Monroeville, PA at the time of the discovery.

The misappropriated trade secret involves proprietary designs and manufacturing processes for high-end fashion garments, including fashion accessories.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury fashion industry.

### 17. Guccio Gucci S.p.A.

On about or before mid 2024, The Plaintiff, discovered that The Defendants along with Alexander McQueen Trading Limited had accessed confidential files containing trade secrets without authorization. The Plaintiff was in Monroeville, PA at the time of the discovery.

The misappropriated trade secret involves proprietary designs and manufacturing processes for high end fashion products.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury fashion industry.

### 18. Alexander McQueen Trading Limited

Between May and July, The Plaintiff, discovered that The Defendants along with Alexander McQueen Trading Limited had accessed confidential files containing trade secrets without authorization. The Plaintiff was in Monroeville, PA at the time of the discovery.

The misappropriated trade secret involves proprietary designs and manufacturing processes for high-end fashion products.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury fashion industry.

### 19. Undercover Co, Ltd.

Between May and July, The Plaintiff, discovered that The Defendants along with Undercover Co, Ltd. had accessed confidential files containing trade secrets without authorization. The Plaintiff was in Monroeville, PA at the time of the discovery.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique high-end fashion accessories.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the fashion industry.

### 20. Comme des Garçons Co., Ltd.

Between May and July, The Plaintiff, discovered that The Defendants along with Comme des Garçons Co., Ltd. had accessed confidential files containing trade secrets without authorization. The Plaintiff was in Monroeville, PA at the time of the discovery.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique apparel.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury fashion industry.

### 21. Kids Love Gaite Co., Ltd.

Between May and July, The Plaintiff, discovered that The Defendants along with Kids Love Gaite Co., Ltd. had accessed confidential files containing trade secrets without authorization. The Plaintiff was in Monroeville, PA at the time of the discovery.

The misappropriated trade secret involves proprietary designs and manufacturing processes for high-end footwear.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the high-end fashion industry.

### 22. H & M Hennes & Mauritz AB

Between May and July, The Plaintiff discovered that The Defendants along with H & M Hennes & Mauritz AB had accessed confidential files containing trade secrets without authorization. The Plaintiff was in Monroeville, PA at the time of the discovery.

The misappropriated trade secret involves proprietary designs and manufacturing processes for apparel and accessories.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the fashion industry.

### 23. 3.PARADIS, Inc.

Between May and July, The Plaintiff discovered that The Defendants along with 3.PARADIS, Inc. had accessed confidential files containing trade secrets without authorization. The Plaintiff was in Monroeville, PA at the time of the discovery.

The misappropriated trade secret involves proprietary designs and manufacturing processes for high-end apparel.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the high-end fashion industry.

## 24. JORDANLUCA, Ltd.

Between May and July, The Plaintiff discovered that The Defendants along with JORDANLUCA, Ltd. had accessed confidential files containing trade secrets without authorization. The Plaintiff was in Monroeville, PA at the time of the discovery.

 The misappropriated trade secret involves proprietary designs and manufacturing processes for unique fashionable apparel.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the fashion industry.

## 25. Ralph Lauren Corporation

Between May and July, The Plaintiff discovered that The Defendants along with Ralph Lauren Corporation had accessed confidential files containing trade secrets without authorization. The Plaintiff was in Monroeville, PA at the time of the discovery.

The misappropriated trade secret involves proprietary designs and manufacturing processes for High-Fashion Accessories.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury fashion industry.

## 27. Maison Goyard

Between May and July, The Plaintiff discovered that The Defendants along with Maison Goyard had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for luxury leather goods.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury fashion industry.

28. Denim Tears LLC.

Between May and July, The Plaintiff discovered that The Defendants along with  Denim Tears LLC. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for high-quality denim and unique prints.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the fashion industry.

29. Loewe S.A

Between May and July, The Plaintiff discovered that The Defendants along with Loewe S.A. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for fashion apparel, and accessories.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury fashion industry.

30. Chrome Hearts LLC.

Between May and July, The Plaintiff discovered that The Defendants along with  Chrome Hearts LLC. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for high-quality denim and unique prints.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury fashion industry.

### 31. Belts by Simon, Inc.

Between May and July, The Plaintiff discovered that The Defendants along with Belts by Simon, Inc. had accessed confidential files containing trade secrets without authorization. 3944 Monroeville Blvd, which is The Plaintiff's place of residence.

The misappropriated trade secret involves proprietary designs and manufacturing processes for high-quality accessories.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the fashion industry.

### 32. Wockstar LLC.

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, The Plaintiff discovered that The Defendants along with Wockstar LLC. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique apparels.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the fashion industry.

### 33. Nike, Inc.

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, The Plaintiff discovered that The Defendants along with Nike, Inc. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique fabric treatments.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the athletic footwear and apparel industry.

### 34. Under Armour, Inc.

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, The Plaintiff discovered that The Defendants along with Under Armour, Inc. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique fabric treatments.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the athletic footwear and apparel industry.

### 35. adidas AG

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with adidas AG had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique fabric treatments.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the athletic footwear and apparel industry.

### 36. PUMA SE

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with PUMA SE had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique fabric treatments.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the athletic footwear and apparel industry.

### 37. ROMBAUT SRL.

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with ROMBAUT SRL. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique fabric treatments.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the athletic footwear and apparel industry.

### 38. The Timberland Company

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with The Timberland Company had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique fabric treatments.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the footwear and apparel industry.

### 39. Carhartt, Inc.

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Carhartt, Inc. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique fabric treatments.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the workwear and apparel industry.

### 40. Ulysse Nardin, Inc.

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Ulysse Nardin, Inc. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique timepieces.
This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury watchmaking industry.

### 41. Horométrie SA

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Horométrie SA had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury watchmaking industry.

### 42. Seiko Watch Corporation

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Seiko Watch Corporation had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the watchmaking industry.

### 43. Hublot of America

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Hublot of America had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury watchmaking industry.

### 44. Rolex Watch U.S.A., Inc.

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Rolex Watch U.S.A., Inc. had accessed confidential files containing trade secrets without authorization.
The misappropriated trade secret involves proprietary designs and manufacturing processes for unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury watchmaking industry.

### 45. Jacob & Co. Inc.

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Jacob & Co. Inc. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury watchmaking industry.

### 46. Patek Philippe USA, Inc.

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Patek Philippe USA, Inc. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury watchmaking industry.

### 47. Casio America, Inc.

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Casio America, Inc. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the watchmaking industry.

48. USAPE LLC.

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with USAPE LLC. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the watchmaking industry.

49. Adabar Ltd.

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Adabar Ltd. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the watchmaking industry.

50. Vacheron Constantin SA

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Vacheron Constantin SA had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for luxury unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the watchmaking industry.

51. Ludovic Ballouard SA

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Ludovic Ballouard SA had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique timepieces.
This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury watchmaking industry.

52. Softwatch Ltd

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Softwatch Ltd. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the watchmaking industry.

53. Piaget SA

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Piaget SA had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury watchmaking industry.

54. IWC International Watch Co. AG

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with IWC International Watch Co. AG had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury watchmaking industry.

## 55. Berneron SA

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Berneron SA had accessed confidential files containing trade secrets without authorization.
The misappropriated trade secret involves proprietary designs and manufacturing processes for unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the watchmaking industry.

## 56. Officine Panerai S.p.A.

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Officine Panerai S.p.A. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for luxury unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the watchmaking industry.

## 57. Richemont North America, Inc.

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Richemont North America, Inc. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for luxury unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the watchmaking industry.

## 58. Audemars Piguet (North America) Inc.

Between May and July, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Audemars Piguet (North America) Inc. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for luxury unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the watchmaking industry.

## 59. Bovet Fleurier S.A.

On about or between June and July 2024, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Bovet Fleurier S.A. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury watchmaking industry.

## 60. MB&F SA

On about or between June and July 2024, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with MB&F SA had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury watchmaking industry.

### 61. Manufacture Jaeger-LeCoultre SA

On about or between June and July 2024, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Manufacture Jaeger-LeCoultre SA had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury watchmaking industry.

### 62. Konstantin Chaykin

On about or between June and July 2024, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Konstantin Chaykin had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury watchmaking industry.

### 63. Alexander Shorokhoff Uhrenmanufaktur GmbH

On about or between June and July 2024, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Alexander Shorokhoff Uhrenmanufaktur GmbH had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury watchmaking industry.

### 64. Greubel Forsey SA

On about or between June and July 2024, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Greubel Forsey SA had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique timepieces.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the luxury watchmaking industry.

### 65. Glock, Inc.

On about or between approximately 2022 to the present day, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Glock, Inc. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique firearms and firearm accessories.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the firearms industry.

### 66. Carl Walther GmbH Sportwaffen

On before or between approximately 2023-2024, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Carl Walther GmbH Sportwaffen had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique firearms.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the firearms industry.

### 67. Bintac, LLC.

On about or before approximately 2023, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Bintac, LLC. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique firearms.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the firearms industry.

## 68. LANTAC USA LLC.

On about or before approximately 2023, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with LANTAC USA LLC. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique firearms.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the firearms industry.

## 69. X Products LLC.

On about or before approximately 2023, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with X Products LLC. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique firearms.
This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the firearms and ammunition industry.

## 70. FN Herstal

On about or before approximately 2023, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with FN Herstal had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique firearms.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the firearms and ammunition industry.

### 71. Viridian Weapon Technologies

On about or before approximately 2023, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Viridian Weapon Technologies had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique firearms.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the firearms and ammunition industry.

### 72. Recover Innovations Inc.

On about or before approximately 2023, The Plaintiff noticed that The Defendants along with Recover Innovations Inc., infringed on trade secrets belonging to Diamond Buchanan.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique firearms.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the firearms industry.

### 73. Kel-Tec CNC Industries Inc.

On about or between approximately 2023-2024, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Kel-Tec CNC Industries Inc. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique firearms.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the firearms industry.

### 74. Boost Toys

On about or before approximately 2023, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Boost Toys had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for unique gel blasters.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the recreational toy industry.

### 75. Holosun Technologies Inc.

On about or before approximately 2023, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Holosun Technologies Inc. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for firearm accessories.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the firearms and optics industry.

### 76. Covert Arms HWS ARD

On about or before approximately 2023, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Covert Arms HWS ARD had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for firearm accessories.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the firearms and tactical gear industry.

### 77. Buck Knives, Inc.

On or about Between June and July 2024, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that The Defendants along with Buck Knives, Inc. had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for a unique knife.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the cutlery industry.

### 78. PES LASER

On or about Between June and July 2024, The Plaintiff, while at 3944 Monroeville Blvd, which is The Plaintiffs place of residence, discovered that various The Defendants along with PES LASER had accessed confidential files containing trade secrets without authorization.

The misappropriated trade secret involves proprietary designs and manufacturing processes for a unique laser.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the laser technology industry.

### 79. Crunchyroll, LLC.

On or about June 18, 2024, The Plaintiff discovered that The Defendants, together with Crunchyroll, LLC had used The Plaintiff's work in the production and distribution of the Tower of God, I Was Reincarnated as the 7th Prince so I Can Take My Time Perfecting My Magical Ability, Gods' Games We Play, An Archdemon's Dilemma: How to Love Your Elf Bride, Chillin' in Another World with Level 2 Super Cheat Powers, including Unnamed Memory without authorization.

The misappropriated trade secret involves proprietary designs for plots of various television series.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the entertainment industry.

### 80. Netflix, Inc

## 81. Epic Games, Inc.

On or about between mid 2023 to the present day, and The Plaintiff noticed that The Defendants have accessed and misappropriated proprietary game development, trade secrets and unreleased game content from Epic Games, Inc. Despite illegal monitoring, unreasonable search and seizure, and blackmail.

The misappropriated trade secret involves proprietary designs for video game designs. This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the video game and software development industry.

## 82. Northrop Grumman

On or about July 5, 2024 The Plaintiff noticed that The Defendants together with Northrop Grumman, infringed on Proprietor property belonging to The Plaintiff.

The misappropriated trade secret involves proprietary designs and manufacturing processes for a unique military watercraft.

This information includes confidential specifications, innovative features, and production techniques that provide a competitive edge in the maritime industry.

### Protection of Trade Secrets:
The Plaintiff, Mr Buchanan took reasonable measures to protect the trade secrets by securely storing them in the plaintiffs Google drive, and/or IPhone in which the plaintiffs has an iCloud account, ensuring that access was restricted to authorized personnel only.

These infringements have also taken place globally, affecting Buchanan during travels around the world.

### Limited Access:
Mr. Buchanan was the only person with legitimate access to the confidential information, ensuring that sensitive data was not disclosed unnecessarily.

### Security Protocols:
Robust security measures, both physical and digital, were established to safeguard trade secrets, including password-protected files, encrypted communications, and secure storage of physical documents.

## Monitoring and Auditing:

Monitoring systems were instituted to track access to sensitive information, and audits were conducted to ensure compliance with established security protocols. However, it became apparent that some files had gone missing during these audits, raising concerns about potential unauthorized access and further underscoring the need for vigilance in protecting trade secrets.

## Scope of Misappropriation:

Multiple companies have misappropriated the plaintiff's trade secrets, and the scope of infringement is so vast that the plaintiff is continually identifying new violations. The financial impact is enormous and ongoing, as more instances of misappropriation continue to surface, each revealing significant unauthorized use of the plaintiff's proprietary ideas.

## Legal Recourse:

The plaintiff remains vigilant in monitoring potential infringements of their trade secrets and is prepared to take legal action against any individual or entity that unlawfully accesses or uses their proprietary information. The plaintiff actively seeks legal counsel to understand their rights and options, ensuring readiness to pursue claims for damages and enforce trade secret protections as necessary. This proactive approach underscores the plaintiff's commitment to safeguarding their intellectual property and seeking justice for any unauthorized use or exploitation.

**Federal Tort Claims Act (FTCA) Claim for Damage, Injury, or Death**
**(Standard Form 95)**

Defendant(s)

Defendant No. 1
- Name: Prof. Tamar Makin
- Job or Title: Professor of Cognitive Neuroscience
- Street Address:15 Chaucer Rd, Cambridge CB2 7EF, United Kingdom
- Email: tamar.makin@mrc-cbu.cam.ac.uk
- Telephone Number: +44 1223 766 166
- City and Country: Cambridge, England

Defendant No. 1
- Name: Dani Clode
- Job or Title: Designer collaborating with the Plasticity Lab
- Street Address:15 Chaucer Rd, Cambridge CB2 7EF, United Kingdom
- Email: dani.clode@mrc-cbu.cam.ac.uk
- City and Country: Cambridge, England

Defendant No. 2
- Business Name: Apple Inc.
- Telephone Number: 1-800-275-2273
- City and County: Cupertino, Santa Clara County
- State and Zip Code: California, 95014
- Corporate Mailing Address: One Apple Park Way, Cupertino, CA 95014

Defendant No. 3
- Business Name: Samsung Electronics Co. Ltd.
- Telephone Number: +82 31-200-1114
- City and County: Suwon, Yeongtong-Gu
- State and Zip Code: Seoul, 16677
- Corporate Mailing Address: 129, Samsung-Ro, Yeongtong-Gu, Suwon, Seoul, 16677

Defendant No. 4
- Business Name: Huawei Technologies Co. Ltd.
- Telephone Number: +86 755 28780808
- City and County: Shenzhen, Longgang District
- State and Zip Code: Guangdong, 518100
- Corporate Mailing Address: Bantian, Huawei Base, Longgang District, Shenzhen, Guangdong, 518100

Defendant No. 5
- Business Name: Mercedes-Benz USA
- Telephone Number: 1-800-367-6372
- City and County: Sandy Springs, Fulton County
- State and Zip Code: Georgia, 30328
- Corporate Mailing Address: 1 Mercedes-Benz Drive, Sandy Springs, GA 30328

Defendant No. 6
- Business Name: Hyundai Motor Company
- Telephone Number: 1-800-633-5151
- City and County: Fountain Valley, Orange County
- State and Zip Code: California, 92708
- Corporate Mailing Address: 10550 Talbert Avenue, Fountain Valley, CA 92708

Defendant No. 7
- Business Name: Volkswagen Group of America
- Telephone Number: 1-800-822-8987
- City and County: Reston, Fairfax County
- State and Zip Code: Virginia, 20190
- Corporate Mailing Address: 1950 Opportunity Way, Reston, VA 20190

Defendant No. 8
- Business Name: General Motors Company
- Telephone Number: 1-800-462-8782
- City and County: Detroit, Wayne County
- State and Zip Code: Michigan, 48265
- Corporate Mailing Address: 300 Renaissance Center, Detroit, MI 48265

Defendant No. 9
- Business Name: Stellantis N.V.
- Telephone Number: +31 23 700 1511
- City and County: Hoofddorp, Haarlemmermeer
- State and Zip Code: North Holland, 2132 LS
- Corporate Mailing Address: Taurusavenue 1, 2132 LS Hoofddorp, The Netherlands

Defendant No. 10
- Business Name: Renault USA, Inc.
- Telephone Number: 1-845-207-6604
- City and County: Boulogne-Billancourt, near Paris (Note: Renault's headquarters is in France, but they have operations in the USA)
- State and Zip Code: N/A (since the headquarters is in France)

Defendant No. 11
- Business Name: MG Motor
- Telephone Number: +44 121 655 0365
- City and County: London, Greater London
- State and Zip Code: NW1 5QE
- Corporate Mailing Address: Westar House, 139-151 Marylebone Road, London, NW1 5QE

Defendant No. 12
- Business Name: Verge Motorcycles OÜ
- Telephone Number: +372 655 0365[1]
- City and County: Liivamäe küla, Jõelähtme vald
- State and Zip Code: Harju maakond, 74207
- Corporate Mailing Address: Ilunurme tee 10/1, Liivamäe küla, Jõelähtme vald, 74207 Harju maakond, Estonia
- Email: info@vergemotorcycles.com

Defendant No. 13
- Business Name: Vetements Group AG
- Telephone Number: +41 646 366 8120
- City and County:
- State and Zip Code: Zürich, 8045
- Corporate Mailing Address: Binzstrasse 44, 8045 Zürich, Switzerland